E-FILED
Monday, 07 October, 2013  03:48:14 PM
Clerk, U.S. District Court, ILCD

**EXHIBIT A**

**IN THE CIRCUIT COURT
FOR THE SEVENTH JUDICIAL CIRCUIT OF ILLINOIS
SANGAMON COUNTY, SPRINGFIELD, ILLINOIS**

FILED

AUG 2 1 2013  CTR-4

Clerk of the
Circuit Court

| | | |
|---|---|---|
| CQUEST AMERICA, INC., an Illinois not-for profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | No.  **2013L  00199** |
| v. | ) ) | Amount Claimed: $700,000 plus costs |
| | ) ) ) | |
| YAHASOFT, INC., a Georgia business corporation, | ) ) ) | Breach of Contract |
| Defendant. | ) ) | |

## <u>COMPLAINT AT LAW</u>

CQUEST AMERICA, INC., an Illinois not-for profit corporation ("**CQuest**"), plaintiff herein, by LAW OFFICES OF ROBERT M. BIRNDORF, its attorneys, complaining of YAHASOFT, INC., a Georgia business corporation ("**Yahasoft**"), defendant herein, alleges:

1.     CQuest was and is now a not-for-profit corporation duly organized under the laws of the state of Illinois, existing and in good standing under the laws of the state of Illinois. CQuest's principal office and place of business is in Springfield, Sangamon County, Illinois. CQuest was at all times hereinafter mentioned engaged in the information technology business, specializing in data systems for public health and human services agencies and programs.

1

2.      Yahasoft is a business corporation with its principal office and place of business in Norcross, Georgia. Yahasoft is in the business of developing, designing, integrating and supporting web and client-server software applications for government agencies.

3.      On or about June 1, 2011, CQuest and Yahasoft entered into a written Software Services Agreement ("**Agreement**"), a copy of which is attached hereto and made a part hereof as **Exhibit A**.

4.      The matters out of which CQuest's complaint arise occurred in Sangamon County, Illinois, and this court has jurisdiction of this action pursuant to 735 ILCS 5/2-209(a)(1). Venue properly lies in Sangamon County, Illinois pursuant to 735 ILCS 5/2-101. Jurisdiction and venue are also fixed in Sangamon County pursuant to Section VII. D. of the Agreement.

5.      As set forth in the Agreement, CQuest engaged Yahasoft as its subcontractor to develop and provide a software system and corresponding services pursuant to the requirements of the FY '11 Early Intervention Business Services Contract ("**EI Contract**") awarded to CQuest by the Illinois Department of Human Services ("**DHS**"). Exhibit A to the Agreement sets forth the agreed-upon Statement of Services which specifies the services to be performed by Yahasoft under the Agreement ("**Services**").

6.      As more fully set forth in Exhibit A to the Agreement, Yahasoft agreed to provide development, implementation, customization, and maintenance services for the Yahasoft Early Intervention Data System ("**Software**") on the terms and conditions set forth in the Agreement. The Services were in all material respects for the "back-end" Central Billing Office function of the EI Contract.

7.    The Agreement provides in pertinent part as follows:

"I. YAHASOFT RESPONSIBILITIES

A.    **To provide all services required of Yahasoft pursuant to the EI Contract as set forth in the Statement of Services attached hereto as Exhibit A. The Software shall be implemented for functionality on a SQL server database on or before June 30, 2012**. (emphasis added)
...

III.

CQuest shall pay Yahasoft for the performance of services under this Agreement on the following terms:

A. Aggregate compensation by Time Period:

| Period | Compensation |
|---|---|
| Effective Date – June 30, 2012 | $800,000 (**implementation, customization per Exhibit A**) (emphasis added) |

...

B. Payment Terms:

i. Yahasoft will invoice CQuest monthly with the schedule below, **specifying the services performed during the period, with specific reference to the Statement of Services** (Exhibit A). Yahasoft shall maintain and provide to CQuest with each invoice Yahasoft's records of all services performed under this Agreement...

| Effective Date – June 30, 2012 | $60,000 per month and last month will be paid the rest of $800,000..." (emphasis added) |
|---|---|

8.    Commencing in June 2011, Yahasoft began work on the Software pursuant to the Agreement, but thereafter failed to perform the Services in a competent, diligent, and timely manner. Yahasoft failed to provide implementation and customization services as required by the

Agreement, and further failed to complete said Services on or before June 30, 2012 as required by the Agreement.

9.     Yahasoft's failure to render Services as required by the Agreement within the time therein provided constitutes a material breach of the Agreement. Yahasoft's breach of the Agreement continues to the date hereof, as the required Services have not been provided and neither the Software nor any component thereof have been provided to CQuest for use in connection with the EI Contract.

10.     In further breach and violation of Yahasoft's responsibilities under Section I. B. of the Agreement, Yahasoft's invoices fail to specify Services performed on a monthly basis by reference to the Statement of Services or otherwise. Despite Yahasoft's breaches as aforesaid, CQuest has paid Yahasoft's invoices in the aggregate amount of $540,000 for the period from June 2011 through March 2012. As of April 1, 2012, based on the aforesaid breaches of the Agreement by Yahasoft, CQuest ceased paying additional invoices presented by Yahasoft.

11.     CQuest has paid Yahasoft the sum of $540,000 to date for Software which Yahasoft has not implemented or customized for functionality as required by the Agreement. CQuest has not received the agreed-upon Services or Software and has been damaged thereby.

12.     CQuest has duly performed all of the terms and conditions of the Agreement on its part to be performed.

13.     As a direct and proximate result of Yahasoft's breaches as aforesaid as well as pursuant to Section IV. A. of the Agreement, CQuest has provided Yahasoft with notice of the termination of the Agreement, and the Agreement has been terminated effective June 30, 2013. A copy of the notice of termination is attached hereto as **Exhibit B**.

4

14.    As a direct and proximate result of the foregoing breaches by Yahasoft, CQuest has been damaged in an amount in excess of $700,000, said sum consisting of $540,000 paid to Yahasoft for Services which have not been provided; project management fees in excess of $110,000 necessitated by Yahasoft's participation as a subcontractor on the EI Contract; travel and administrative costs; and other costs and expenses, including without limitation CQuest's reasonable attorneys' fees and costs to date in acting to enforce the Agreement as provided in VII. D. thereof.

WHEREFORE, plaintiff CQUEST AMERICA, INC. prays for judgment against defendant YAHASOFT, INC. in an amount in excess of $700,000.00, plus interest, costs of suit, reasonable attorneys' fees and such other and further relief as this Court shall deem just and proper.

CQUEST AMERICA, INC.

By: _Robert M. Birndorf_

One of its attorneys

Robert M. Birndorf
Law Offices of Robert M. Birndorf
200 West Madison Street
Suite 2100
Chicago, Illinois 60606
(312) 407-6363
ARDC No. 3123173

5

# EXHIBIT A

## SOFTWARE SERVICES AGREEMENT

This Software Services Agreement (the "**Agreement**") is made and entered into as of this 1st day of June, 2011 by and between CQuest America, Inc., an Illinois not-for-profit corporation ("**CQuest**"), having offices at 500 S. 9th Street, Springfield, Illinois 62701, and Yahasoft, Inc., a Georgia business corporation ("**Yahasoft**"), having offices at 5696 Peachtree Parkway, Suite A, Norcross, Georgia 30092.

### WITNESSETH:

WHEREAS, the Illinois Department of Human Services ("**DHS**") has provided notice of its intention to award the FY '11 Early Intervention Business Services contract ("**EI Contract**") to CQuest;

WHEREAS, the EI Contract covers the adjudication of Early Intervention provider services claims, submission of claims to Illinois Department of Healthcare and Family Services, acceptance of Early Intervention provider enrollment, and management of family fee invoicing and receivables;

WHEREAS, CQuest, in response to the RFP for the EI Contract, has identified Yahasoft as a subcontractor to be engaged by CQuest to develop and provide a software system and services pursuant to the requirements of the EI Contract;

WHEREAS, Yahasoft is willing to provide development, implementation, customization, data conversion, and maintenance services for the Yahasoft Early Intervention Data System ("**YEIDS**" or the "**Software**") as CQuest's subcontractor pursuant to the EI Contract on the terms and conditions set forth herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed as follows:

## I. YAHASOFT RESPONSIBILITIES:

A. To provide all services required of Yahasoft pursuant to the EI Contract as set forth in the Statement of Services attached hereto as **Exhibit A**. The Software shall be implemented for functionality on a SQL server database on or before June 30, 2012.

B. At no additional charge to CQuest, to provide the following updates and enhancements to the Software, keeping the Software in compliance with federal and state regulated changes which CQuest identifies in writing or of which Yahasoft has become aware.

Yahasoft keeps abreast of Part C programs adjustments from federal and state policy changes and will update the software accordingly as part of regular maintenance. Examples of these simple adjustments may include:
  o Federal poverty guidelines
  o Federal parameters for acceptable performance of OSEP indicators
  o Additions or deletions of particular services required by OSEP to be provided by Part C
  o Adjustment of public school district borders
  o Adjustment of terminology reflecting changes in state or lead agency policy and procedure

Any federal and state policy changes that require a new screen or process to the database will be evaluated and cost quoted according to rates specified in Exhibit A. Yahasoft shall follow a standard change request process with future program updates and system functionality enhancement. For those major federal changes that affect all states, YahaSoft will work with all clients to come to fair and accurate assessment of the changes overall.

C. To provide daily support and maintenance of YEIDS as follows:

i. Yahasoft shall provide support for CQuest's technical staff and DHS to include data transfer, loading of data to database, and correcting software-related data issues.

ii. Support shall be available Monday through Friday, from 7:00 a.m. to 5:00 p.m. Central Standard Time with a response time of 2 hours for critical issues, 8 hours for non-critical issues, but no more than 16 hours. If the issue cannot be resolved with the above response

2

time, Yahasoft will inform CQuest of the estimated response time with the proper reason why it cannot be resolved within the standard response time. The percentage of these cases should not exceed 5% of all support issues. This support shall continue to be available for the Software so long as the EI Contract shall remain in effect.

iii.     In the event that DHS requires after hours support, other than those defined in Section C, item ii above, Yahasoft will provide a mechanism for providing such support.

D.     To provide reasonable tools and technology to assure that the Software is at all times compliant with applicable HIPAA Privacy and Security standards and related rules and standards which may be promulgated under HIPAA. Yahasoft shall concurrently herewith execute the HIPAA Rider (**Exhibit B**) and shall at all times during the Term hereof and thereafter comply with Yahasoft's obligations as a Business Associate as set forth therein.

E.     Yahasoft gives CQuest the rights to use the software for Illinois Early Intervention Program. Yahasoft reserves all other rights.   Unless otherwise provided by law, CQuest may use the Software only as expressly permitted in this Agreement. CQuest may not:

- Reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits, despite this limitation;

- Publish the software for others to copy;

- Rent, lease, resell or lend the Software to entities other than Illinois Early Intervention Program.

In the event that Yahasoft becomes unable to perform the services required hereunder, due to bankruptcy, insolvency, liquidation, or other similar proceedings which are not dismissed within sixty (60) days after their commencement, Yahasoft agrees to provide a copy of the source code and related documentation to CQuest, and that CQuest shall have an irrevocable license to use the source code for YEIDS as required to meet CQuest's obligations to DHS under the EI contract.

3

F.    Yahasoft warrants to CQuest that Yahasoft has developed, owns, and/or possesses all rights and interests in the Software necessary to enter into this Agreement. Yahasoft further warrants to CQuest for one (1) year from the date of final installation of the Software that the Software, unless modified in a manner not permitted under this Agreement, will substantially perform the material functions described in the Yahasoft User Materials when operated on hardware and, as applicable, with third party software approved for use with YEIDS.

G.    Yahasoft agrees, at its sole cost and expense, to procure and maintain such policies of insurance as are reasonable and customary for a contractor providing the type of services described herein, including, but not limited to, a policy to insure against any claim or claims for damages to which CQuest may be subject under this Agreement, as follows:

    i.    Workers' Compensation / Employers' Liability (including all states coverage) with a limit not less than the relevant statutory amount or one million dollars ($1,000,000) per occurrence for employers' liability, whichever is greater.

    ii.    Comprehensive Commercial General Liability (including personal injury & property damage, premises / operations, independent contractor, contractual liability and completed operations / products) with a bodily injury / property damage combined single limit not less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) aggregate.

H.    Yahasoft shall concurrently herewith execute the Ethics Responsibility Rider (**Exhibit C**) and shall at all times during the Term hereof and thereafter comply with Yahasoft's obligations as set forth therein.

4

## II.    CQUEST RESPONSIBILITIES:

A.    To make all payments due to Yahasoft for its services rendered hereunder in accordance with the terms of Section III, below.

B.    To fulfill all of CQuest's obligations as a contractor for DHS under the HIPAA Rider executed concurrently herewith between CQuest and Yahasoft (**Exhibit B**).

C.    CQuest shall provide Yahasoft with reasonable access to CQuest's Project Manager and Project Personnel to address, support, and resolve ongoing issues relating to the services to be provided by Yahasoft hereunder.

D.    To provide Yahasoft with such other support, assistance, and cooperation as Yahasoft may reasonably request in order to facilitate Yahasoft's performance of its services hereunder.

## III.    PRICING AND PAYMENT:

CQuest shall pay Yahasoft for the performance of services under this Agreement on the following terms:

A.    **Aggregate Compensation by Time Period:**

| Period | Compensation |
|---|---|
| Effective Date – June 30, 2012 of Agreement | $800,000 (implementation, customization per Exhibit A) |
| July 1, 2012 – June 30, 2013* | $500,000 (maintenance per Exhibit A) |
| July 1, 2013 – June 30, 2014* | $500,000 (maintenance per Exhibit A) |

*Contingent on renewal of EI Contract for each respective period

5

B.     **Payment Terms:**

   i.     Yahasoft will invoice CQuest monthly with the schedule below, specifying the services performed during the period, with specific reference to the Statement of Services (**Exhibit A**). Yahasoft shall maintain and provide to CQuest with each invoice Yahasoft's records of all services performed under this Agreement. New screens and new processes to the database shall require Yahasoft to specify the number of hours worked, applicable rates, and services performed in Yahasoft's invoices to CQuest.

   Effective Date – June 30, 2012        $60,000 per month and last month will be paid the rest of $800,000

   July 1, 2012 – June 30, 2013*       $41,667 per month

   July 1, 2013 – June 30, 2014*       $41,667 per month

   *Contingent on renewal of EI Contract for each respective period

   ii.     Within ten (10) business days of CQuest's receipt of payment from DHS for each monthly period, CQuest shall pay Yahasoft for corresponding approved invoices submitted to CQuest.

IV.   **TERM AND TERMINATION:**

A.     This Agreement shall commence and become effective as of the date of full execution by the parties, and shall continue in force and effect through June 30, 2012 (the "**Termination Date**"); provided, however, that this Agreement shall be automatically renewed and extended for successive one (1) year periods to commence the day following the Termination Date and the anniversary thereof, unless either party gives notice to the other at least fifteen (15) days prior to the Termination Date, or the anniversary thereof, of its intention to terminate the Agreement.

B.    In no event shall this Agreement be or remain in effect after June 30, 2014 unless extended in writing, signed by a duly authorized agent of each of the parties hereto.

C.    Notwithstanding anything to the contrary provided in this Section IV.,

i.    CQuest may immediately terminate this Agreement if there shall be filed by or against Yahasoft any petition in bankruptcy under any state or federal law, or if a receiver or trustee shall be appointed for Yahasoft's business or property, or if Yahasoft shall make an assignment for the benefit of creditors or if there shall be a material adverse change in the financial condition of Yahasoft, or if Yahasoft shall otherwise be in breach of any other covenant, warranty, or term hereunder, which breach continues for thirty (30) days after written notice thereof; and

ii.   This Agreement shall automatically terminate immediately and be a nullity if the EI Contract is not fully executed on or before May 1, 2011. The Agreement shall also terminate immediately upon the termination or expiration of the EI Contract, including renewals thereof. No such termination of this Agreement shall affect the obligations of either party arising prior or subsequent to the effective date of termination.

## V.    JOINT RESPONSIBILITIES AND ACKNOWLEDGEMENTS:

A.    **Yahasoft's Authority to Provide Services:**

The taxpayer ID number of Yahasoft is 582585972. Yahasoft is licensed to perform the agreed upon services enumerated herein and covenants that it maintains all valid licenses, permits and registrations to perform same.

B.    **Personnel:**

Yahasoft will utilize individuals who possess the requisite skill for providing all services required of Yahasoft hereunder. Yahasoft shall provide such documentation as CQuest may from time to time request in connection with all services provided hereunder. CQuest may at any time at its sole discretion require Yahasoft to remove any individuals providing services hereunder, and either to replace such individuals with individuals satisfactory to CQuest, or to proceed without replacing the individuals removed.

C.    **Accountabilities:**

Yahasoft's services, work location, and corresponding work produced will be directed, monitored, and reviewed by Jeff Hamrick or designee.

D.    **Competent Work:**

All work will be done in a competent fashion in accordance with applicable standards of the profession and all services are subject to final approval by a representative of CQuest prior to payment.

E.    **Representations and Warranties:**

Yahasoft will make no representations, warranties or commitments binding CQuest without CQuest's prior written consent.

F.    **Legal Right:**

Yahasoft covenants and warrants that it has the unlimited legal right to enter into this Agreement and to perform in accordance with its terms without violating the rights of others or any

8

applicable law and that Yahasoft has not and shall not become a party to any other agreement of any kind which conflicts with this Agreement.

G.     **Non-Competition:**

Unless otherwise provided by law, Yahasoft agrees that without CQuest's prior written approval, neither Yahasoft nor its employees or agents will provide services relating to the Illinois Early Intervention Program for which Yahasoft is providing services under the Agreement for any entity or person other than CQuest for a period of two (2) years following the termination of this Agreement.

Unless otherwise provided by law, CQuest agrees that without Yahasoft's prior written approval, neither CQuest nor its employees or agents will provide Software to any Early Intervention Programs other than Illinois Early Intervention Program under this Agreement for a period of two (2) years following the termination of this Agreement.

H.     **Compliance with State Law:**

Yahasoft acknowledges that it will provide services to CQuest hereunder which are governed by and subject to the requirements of the state of Illinois, and further acknowledges that CQuest has provided it with a copy of the Department of Human Services Certifications (**Exhibit D**). Yahasoft certifies that it is, and shall remain, in compliance with all representations of "Vendor" in the Certifications; that Yahasoft shall provide all documents and information reasonably requested by the state of Illinois; and that it shall otherwise fully cooperate with CQuest in responding to all inquiries from the state of Illinois in connection with Yahasoft's services and its certifications made hereunder.

9

I.  **Non-Disclosure:**

Neither party hereto shall in any way or in any form disclose, publicize or advertise in any manner the discussions that gave rise to this Agreement or the discussions, negotiations or terms covered by this Agreement including contract terms and rates, to any third party without the prior written consent of the other party, unless pursuant to the lawful requirement of a government agency or disclosure is required through operation of law. Legal counsel, financial advisors, and other professionals retained by either party for the purpose of reviewing or providing professional advice based on this Agreement are not considered a third party covered by this non-disclosure paragraph.

J.  **Nonsolicitation:**

Throughout the term of this Agreement and for a period of one (1) year thereafter, neither CQuest nor Yahasoft will, without the prior written consent of the other, (a) solicit for hire or engagement, directly or indirectly, any of the other party's personnel or (b) hire or engage, directly or indirectly, any person or entity who is or was employed or engaged by the other party and with whom the hiring party has had contact during this Agreement until the expiration of one hundred eighty (180) days following the termination of such person's or entity's employment or engagement with the other party. For the purposes of this provision, "solicit" shall not be deemed to include broad based recruiting efforts, including, but not limited to, help wanted advertising and posting of open positions on a party's Internet site.

K.  **Records:**

CQuest and Yahasoft shall maintain documentation for all services provided and compensation paid and received under this Agreement. The books, records, and documents of the parties relating thereto shall be maintained for a period of three (3) years from the date of final payment

made to Yahasoft hereunder, and shall be subject to audit at any reasonable time and upon reasonable notice.

L.   **Confidentiality:**

Each party shall maintain the confidentiality of the other party's data and information hereunder in accordance with all terms and conditions of the Confidentiality Agreement attached hereto as **Exhibit E.**

## VI.   LIMITATION OF LIABILITY / INDEMNITY:

A.   Yahasoft shall indemnify, defend and hold harmless CQuest, its directors, officers, employees, agents, successors, and affiliates, from and against all losses, claims, liabilities, damages, and expenses, including reasonable attorneys' fees (collectively **"Damages"**) arising out of Yahasoft's acts or omissions in the performance of Yahasoft's obligations under this Agreement.

B.   CQuest shall indemnify, defend and hold harmless Yahasoft, its directors, officers, employees, agents, successors, and affiliates, from and against all Damages arising out of CQuest's acts or omissions in the performance of CQuest's obligations under this Agreement.

C.   The obligations of the parties to indemnify and hold each other harmless shall survive the termination of this Agreement.

D.   In no event shall either CQuest or Yahasoft be liable to the other for any indirect, punitive, special or consequential damages as a result of or in any way connected to the performance or failure to perform of CQuest or Yahasoft under this Agreement, whether liability is asserted in contract or tort (including negligence and strict product liability), and even if CQuest or Yahasoft has been specifically advised concerning the possibility of such damages.

11

## VII.    MISCELLANEOUS PROVISIONS:

A.    In the performance of the duties and obligations imposed upon CQuest and Yahasoft under this Agreement, each party is and at all times acting as an independent contractor. Neither party shall have nor exercise any control or direction over the methods by which the other party shall perform its duties and obligations arising hereunder. This Agreement is not, and shall not be considered, an employer-employee relationship, joint venture, or partnership of any kind and neither party shall represent to any third persons that any such relationship exists. Each party to this Agreement is and shall remain professionally and economically independent of the other.

B.    This Agreement shall be binding upon and inure to the benefit of the parties, and their respective successors, affiliates, and assigns, but neither party may assign, subcontract, or transfer this Agreement, in whole or in part, without the express written consent of the other party.

C.    Any notice which may be required to be given hereunder shall be in writing and delivered personally, sent by registered or certified mail, return receipt requested, postage prepaid, or sent by overnight delivery service by a nationally recognized air courier, such as, but not limited to Federal Express or UPS addressed as follows:

|                      |                                         |
|----------------------|-----------------------------------------|
| If to CQuest:        | Jeff Hamrick, CEO                       |
|                      | CQuest America, Inc.                     |
|                      | 500 S. 9th Street                        |
|                      | Springfield, IL  62701                   |
|                      |                                          |
| With a copy to:      | Robert M. Birndorf, Esq.                 |
|                      | BIRNDORF & BIRNDORF                       |
|                      | 200 West Madison Street                  |
|                      | Suite 2670                               |
|                      | Chicago, IL  60606                       |
|                      |                                          |
| If to Contractor     | Roy Su                                   |
|                      | Yahasoft, Inc.                           |
|                      | 5696 Peachtree Parkway                   |
|                      | Suite A                                  |
|                      | Norcross, GA 30092                       |

or to such other addresses as either party shall have designated by notice to the other.

Notices mailed by registered or certified mail shall be effective three (3) business days after the date of mailing. Notices sent by nationally recognized air courier shall be effective the next business day after the date of mailing.

D.   This Agreement shall be construed and interpreted in accordance with the laws of the state of Illinois and may be signed in any number of counterparts, each constituting a duplicate original. The jurisdiction and venue for any dispute which may arise between the parties hereto shall be the state and federal courts in Sangamon County, Illinois. The prevailing party shall be entitled to recover its reasonable attorneys' fees and costs in enforcing this Agreement.

E.   This Agreement constitutes the entire agreement between the parties and cannot be modified, altered, or otherwise changed except by an agreement in writing signed by a duly authorized officer of each of the parties hereto. This Agreement has been made for the sole benefit of the parties hereto, and may not be construed to confer benefits or rights upon any other person or entity.

F.   Each party hereto shall provide the other with all such documents and information as the other shall reasonably request in order to perform its obligations under this Agreement.

G.   The provisions of this Agreement shall be deemed severable, and if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

H.   Neither CQuest nor Yahasoft shall be liable for any failure or delay in performing any provision of the Agreement resulting from fire or other casualty, riots, strikes or other labor difficulties, governmental regulations or restrictions, or any cause beyond either party's control provided that the party acts with reasonable diligence.

13

I.     Failure by either party to this Agreement to insist in any one or more cases upon the strict performance of any of the terms, covenants, conditions, or provisions of this Agreement shall not be construed as a waiver or relinquishment of any such term, covenant, condition, or provision. No term or condition of this Agreement may be waived, modified, or deleted except by a written amendment signed by the parties hereto.

J.     Each individual executing this Agreement on behalf of any entity which is a party to this Agreement represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of said entity.

CQuest and Yahasoft each acknowledge they have read this Agreement, understand it, and agree to be bound by its terms and conditions.

IN WITNESS WHEREOF, this Agreement has been executed by a duly authorized agent of each party on the day and year first above written.

CQuest AMERICA INC.,                          Yahasoft, Inc.,
An Illinois Not-for-Profit Corporation

By: _____              By: _____

Printed Name: Jeffrey H. Hamrick             Printed Name: ___Roy Su___

Title: Chief Executive Officer               Title: ___president___

14

**Exhibit A**

STATEMENT OF SERVICES

Implementation
- Gap analysis, data & system requirement gathering

- YahaSoft Software system demonstrations

- Yahasoft Software programs installation

- Data Migration and/or Data Conversions

- YahaSoft Software customization and/or modifications to meet

  current Illinois Early Intervention program requirements:

  1. Support data interface functions with CARS

  2. Support data interface with Cornerstone

  3. Support data interface with Department of Healthcare and Family Services

  4. Modifications or additions to the YahaSoft data reporting system as required by DHS

  5. Modification to the YahaSoft claims processing system as required by DHS

  6. Update the YahaSoft software to comply with federal and/or state Part C program changes

  7. Support data interface with existing 3rd parties as required by DHS, to the extent that these data interfaces can be defined in detail clearly by DHS before 6/30/2012 and can be implemented feasibly before 6/30/2012.

- Parallel system testing

- User acceptance testing

- Train-the-trainer Training and documentation

- Support and System Documentation

Maintenance

Yearly maintenance and support provided by the contractor will include:

- User support
- General questions and assistance in correcting user errors
- These supports will be limited to level-2 support only. The first level of support will be handled by either DHS or CQuest

15

- Bug fixes

- Deployment of software
  - Tweaks to ensure software is working as intended
  - Change needed to correct a performance issue
  - Quick and easy tweaks based on successful work in other states
  - Requested change orders

- Data system maintenance (data corrections, consolidations, etc)
  - Complex inadvertent data errors (ex. duplicate clients need to be merged or Provider Agencies may merge)

- Face-to-face or voice conferences

- Data quality verifications – may include some of the following:
  - Investigate and fix possible duplicate provider/coordinator users
  - Investigate and fix possible duplicate agencies
  - Investigate and fix missing or incorrect data in child record
  - Investigate and fix error audit logs and enhance system

- Database performance tuning up
  - Requires regular remote online access to system to perform functions needed for maintenance
  - Data partitioning, SQL query tuning, and memory tuning.

- Ad hoc data reports (cannot be generated directly from CIS data system) generation and verification to answer questions for State and Federal administrators.

- Federal policy changes
  - YahaSoft keeps abreast of Part C programs adjustments and will update the software accordingly as part of regular maintenance.  Examples of these simple adjustments may include:
    - Federal poverty guidelines
    - Federal parameters for acceptable performance of OSEP indicators
    - Additions or deletions of particular services required by OSEP to be provided by Part C
    - Adjustment of public school district borders
    - Adjustment of terminology reflecting changes in state or lead agency policy and procedure

  - Any changes that require a new screen or process to the database will be evaluated and cost quoted. For those major federal changes that affect all states, YahaSoft will work with all clients to come to fair and accurate assessment of the changes overall, the customization required for each state and then prorate the cost equitably across the states.

- Continuing support of data interface functions with CARS
- Continuing support of data interface functions with Cornerstone

16

- Continuing support of data interface functions with Department of Healthcare and Family Services.
- Continuing support of data interface functions with existing 3rd parties. These interfaces should be limited to the interfaces completed at the implementation phase before 6/30/2012. Any other data interface design/implementation in the future should follow a standard change request process as stated in this Exhibit A.

New Changes

New screens and new processes to the database shall require the Contractor to specify the number of hours worked, applicable rates, and services performed in Yahasoft's invoices to CQuest. The contractor should follow a standard change request process.

Following rates should apply:

| Function | Hourly Rate |
| --- | --- |
| Project Manager | $120 |
| Business Analyst | $100 |
| Software Engineer | $110 |
| Database Administrator | $110 |
| Software QA | $90 |
| System Architect | $120 |

17

**Exhibit B**

HIPAA RIDER – CONTRACTOR

This HIPAA Rider is made a part of the agreement and all amendments, supplements, addenda and exhibits thereto (collectively, the "**Agreement**") entered into by and between CQuest America, Inc., an Illinois not-for-profit corporation ("**CQuest**") and/or Illinois Primary Health Care Association, an Illinois not-for-profit corporation ("**IPHCA**"), and Yahasoft, Inc., a Georgia business corporation ("**Contractor**"), and is effective as of the effective date of the Agreement.

**WITNESSETH:**

**WHEREAS,** CQuest provides services as a contractor of IPHCA, and IPHCA, as a Business Associate under the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as amended, and regulations promulgated thereunder ("**HIPAA**"), is obligated to require IPHCA's subcontractors and agents to be bound by HIPAA's requirements to the same extent as is IPHCA; and

**WHEREAS,** Contractor, as a subcontractor of CQuest or a contractor of IPHCA, is willing to be so bound by the compliance requirements imposed by HIPAA in performing services under the Agreement;

**NOW THEREFORE,** in consideration of the mutual covenants set forth herein and in the Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, CQuest or IPHCA and Contractor agree as follows:

1.      Contractor agrees that any and all Protected Health Information which is received from or created or received by CQuest or IPHCA on behalf of any and all Covered Entities and disclosed to Contractor by CQuest or IPHCA, shall be treated by Contractor and is subject to the same restrictions and conditions that apply to CQuest and IPHCA, as Business Associate, with respect to safeguarding the privacy and security of all such information under HIPAA.

2.      A copy of a specimen HIPAA Business Associate Addendum between IPHCA and a Covered Entity is attached hereto as **Exhibit 1**. Contractor agrees to be bound by the obligations created in the foregoing Business Associate Addendum to the same extent as are CQuest and IPHCA in Contractor's performance of any and all services on behalf of CQuest or IPHCA.

3.      CQuest and IPHCA shall, as applicable, be third-party beneficiaries of this HIPAA Rider. Except for CQuest and IPHCA, nothing in this HIPAA Rider, express or implied, is intended to or shall be construed to confer upon any entities other than the parties hereto, any remedy or claim under or by reason of this HIPAA Rider or any term, covenant or condition hereof, as third-party beneficiaries or otherwise.

4.      Terms used, but not otherwise defined, in this HIPAA Rider shall have the same meanings as ascribed to those terms under HIPAA.

18

IN WITNESS WHEREOF, the parties have duly executed this HIPAA Rider as of the day and year first above written.

☒ CQuest America, Inc.,
   an Illinois not-for-profit Corporation

By: _____

Name: Jeffrey H Hamrick

Title: Chief Executive Officer

Date _5/25/11_____

          OR

☐ Illinois Primary Health Care Association,
   an Illinois Not-for-Profit Corporation

By: _____

Name: _____

Title: _____

Date _____

Contractor

By: _____

Name: _Roy Su_____

Title: _president._____

Date _5/25/11_____

19

**Exhibit 1**

HIPAA BUSINESS ASSOCIATE ADDENDUM


This HIPAA Business Associate Addendum ("**Addendum**") supplements and is made a part of the E-Net Network Services Agreement ("**Agreement**") by and between Illinois Primary Health Care Association, an Illinois not-for-profit corporation ("**Business Associate**") and _____, an Illinois not-for-profit corporation ("**CE**"), and is effective as of the effective date of the Agreement.


**WITNESSETH:**


WHEREAS, CE wishes to disclose certain information to Business Associate pursuant to the terms of the Agreement, some of which may constitute Protected Health Information ("**PHI**");


WHEREAS, CE and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to Business Associate pursuant to the Agreement in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("**HIPAA**"), regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "**HIPAA Regulations**"), as well as the data breach notification requirements promulgated under Subtitle D of the Health Information Technology for Economic and Clinical Health Act ("**HITECH**"), which is Title XIII of the American Recovery and Reinvestment Act of 2009, and any regulations promulgated thereunder, and other applicable laws; and


WHEREAS, the purpose of this Addendum is to satisfy certain standards and requirements of HIPAA and the HIPAA Regulations, including, but not limited to, Title 45, Section 164.504(e) of the Code of Federal Regulations ("**CFR**"), as the same may be amended from time to time.


NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, it is hereby agreed as follows:

1.    <u>Definitions</u>.

All capitalized terms used herein that are not otherwise defined shall have the same meanings as those terms are defined under HIPAA as may be amended from time to time in the Privacy Standards, the Electronic Transactions Standards, the Security Standards and/or HITECH, as applicable, after the Effective Date of this Agreement.

a.    "Breach" "Breach" shall mean the unauthorized acquisition, access, use, or disclosure of protected health information in a manner not permitted under 45 C.F.R. Part 164, Subpart E (the "Privacy Rule"), which compromises the security or privacy of such information. The term "Breach" shall not include:

i. Any unintentional acquisition, access, or use of PHI by a workforce member or person acting under the authority of the CE or Business Associate, if such acquisition, access, or

20

use was made in good faith and within the scope of authority and does not result in further use or disclosure in a manner not permitted under the Privacy Rule; or

ii. Any inadvertent disclosure by a person who is authorized to access PHI at the CE or Business Associate to another person authorized to access PHI at the CE or Business Associate, respectively, or organized health care arrangement (as defined under the HIPAA Regulations) in which the CE participates, and the information received as a result of such disclosure is not further used or disclosed in a manner not permitted under the Privacy Rule; or

iii. A disclosure of PHI where the CE or Business Associate has a good faith belief that an unauthorized person to whom the disclosure was made would not reasonably have been able to retain such information.

    b.    "Business Associate" shall have the meaning given to such term under the HIPAA Regulations, including, but not limited to, 45 CFR Section 160.103.

    c.    "Covered Entity" shall have the meaning given to such term under HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR Section 160.103.

    d.    "Protected Health Information" or "PHI" means any information, whether oral or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual, and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under HIPAA and the HIPAA Regulations, including, but not limited to 45 CFR Section 164.501.

2.    <u>Obligations of Business Associate.</u>

    a.    <u>Permitted Uses and Disclosures.</u> Business Associate may use and disclose PHI received by Business Associate pursuant to the Agreement as necessary to perform all obligations and intended purposes of the Agreement. Except as otherwise limited in this Addendum, Business Associate may disclose PHI to third parties: (i) for its proper management and administration; or (ii) to carry out its legal responsibilities, provided that: (A) the disclosures are Required by Law; or (B) Business Associate obtains reasonable assurances from the person or entity to whom the information is disclosed that such information will remain confidential and will be Used or further Disclosed only as Required by Law or for the purpose for which it was Disclosed to the person, and that such person or entity will promptly notify Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

    b.    <u>Nondisclosure.</u> Business Associate shall not use or further disclose CE's PHI otherwise than as permitted or required by this Addendum or as required by law.

    c.    <u>Safeguards.</u> Business Associate shall use appropriate safeguards to prevent use or disclosure of CE's PHI otherwise than as provided for by this Addendum. Business Associate shall implement administrative, technical and physical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of PHI it creates, receives, maintains, or transmits on behalf of CE.

d.     Reporting.  Business Associate shall immediately, but in no event more than forty-eight (48) hours after becoming aware of a Security Incident or Use or Disclosure of PHI in violation of the Agreement by Business Associate, its officers, directors, employees, representatives, subcontractors, or agents, or by a third party to whom Business Associate disclosed PHI, report any such Security Incident and/or Use or Disclosure to CE.

e.     Business Associate's Agents.  Business Associate shall ensure that any agents, including subcontractors, to whom it provides PHI received from (or created or received by Business Associate on behalf of) CE agree to the same restrictions and conditions that apply to Business Associate with respect to such PHI.

f.     Availability of Information to CE.  Business Associate shall make available to CE such information as CE may require to fulfill CE's obligations to provide access to, provide a copy of, and account for disclosures with respect to PHI pursuant to HIPAA and the HIPAA Regulations, including, but not limited to, 45 CFR Sections 164.524.

g.     Documentation.  Business Associate agrees to document disclosures of PHI and any information related to such disclosures, to the extent such documentation is required under 45 C.F.R. Section 164.528, and to provide to CE such documentation as would be required for CE to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. Section 164.528. Business Associate shall provide an accounting of disclosures through an Electronic Health Record of PHI used for treatment, payment and health care operations.

h.     Amendment of PHI.  When an Individual requests amendment of PHI contained in a Designated Record Set, Business Associate shall promptly make available PHI for amendment and incorporate any amendments to such information in accordance with 45 C.F.R. Section 164.526. Business Associate shall maintain documentation for the longer of the requirements set forth in 45 C.F.R. Section 164.526(f), or the record retention requirements set forth in the Agreement.

i.     Internal Practices.  Business Associate shall make its internal practices, books and records relating to the use and disclosure of PHI received from CE (or created or received by Business Associate on behalf of CE) available to the Secretary of the U.S. Department of Health and Human Services for purposes of determining Business Associate's compliance with HIPAA and the HIPAA Regulations.

j.     Electronic Transactions Regulations.  If Business Associate conducts any Transaction for or on behalf of CE which is covered under the Electronic Transactions Standards from and after the Effective Date, Business Associate agrees that it will comply, and cause its employees, agents, representatives, and subcontractors to comply, with the applicable requirements of the Electronic Transactions Standards.

k.     Notification of Breach.  Business Associate shall first report to CE any Breach of Unsecured PHI as soon as it becomes aware.  The Breach shall be considered "discovered" when the Business Associate knew or reasonably should have known when the Breach occurred.  CE and Business Associate acknowledge that it is the responsibility of CE to ensure that individuals affected by a Breach are notified in accordance with HITECH.  Therefore, Business Associate agrees as follows:

1.     Reporting of Breach.  In the case of a Breach of Unsecured PHI, Business Associate must notify CE of the Breach as soon as the Business Associate becomes aware, and in no case more than two (2) business days after the discovery of the Breach. Business Associate must also, without unreasonable delay, identify each individual

22

whose unsecured PHI has been, or is reasonably believed to have been, accessed, acquired or disclosed as a result of the Breach, and provide such information to CE as needed in order to meet the data breach notification requirements under HITECH, and in any event within twenty (20) calendar days after the discovery of the Breach.

2.  <u>Assistance with Notification</u>.  Business Associate agrees to fully cooperate, coordinate with and assist CE in gathering the information necessary to notify the affected individuals. Specifically, Business Associate agrees to cooperate with CE to ensure that all such Breach of Unsecured PHI notices are without unreasonable delay, and in no case more than sixty (60) days from the discovery of the Breach, or such earlier time period as required under applicable state data breach notification rules. Business Associate agrees that it shall be solely responsible for all reasonable costs and expenses incurred by CE to satisfy CE's obligation under HITECH and the regulations promulgated thereunder to notify individuals and other entities in the event of a Breach of Unsecured PHI by Business Associate.

l.  <u>Minimum Necessary Use and Disclosure</u>. In conducting functions and/or activities under the Agreement (including this Addendum) that involve the Use and/or Disclosure of PHI, Business Associate shall make reasonable efforts to limit the Use and/or Disclosure of PHI to the minimum amount of information necessary as determined by CE to accomplish the intended purpose of the Use or Disclosure.

3.  <u>Obligations of CE:</u>

a.  CE shall be responsible for using appropriate safeguards to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Business Associate pursuant to this Agreement, in accordance with the standards and requirements of HIPAA and the HIPAA Regulations, until such PHI is received by Business Associate.

b.  CE shall notify Business Associate of any limitations in its notice of privacy practices of CE in accordance with 45 CFR 164.520, to the extent that such limitation may affect Business Associate's use or disclosure of PHI.

c.  CE shall notify Business Associate of any changes in, or revocation of, permission to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI.

d.  CE shall notify Business Associate of any restriction to the use or disclosure of PHI that CE has agreed to in accordance with 45 CFR 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

4.  <u>Termination</u>.

a.  <u>Material Breach</u>. A material breach by either party of any provision of this Addendum shall constitute a material breach of the Agreement and shall provide grounds for termination of the Agreement by the non-breaching party, if the breaching party fails to cure the breach within 30 days of receipt of written notice of such breach.

b.  <u>Reasonable Steps to Cure Breach</u>. If a party ("Non-Breaching Party") knows of a pattern of activity or practice of the other party ("Breaching Party') that constitutes a material breach or

violation of any obligation under the provisions of this Addendum, and does not terminate the Agreement pursuant to Section 4.a., then the Non-Breaching Party shall take reasonable steps to cure such breach or end such violation, as applicable. If the Non-Breaching Party's efforts to cure such breach or end such violation are unsuccessful, the Non-Breaching Party shall either (i) terminate the Agreement, if feasible or (ii) if termination of the Agreement is not feasible, the Non-Breaching Party shall report the Breaching Party's breach or violation to the Secretary of the Department of Health and Human Services.

       c.    <u>Judicial or Administrative Proceedings</u>. Either party may terminate the Agreement, effective immediately upon written notice, if (i) the other party is named as a defendant in a criminal proceeding for a violation of HIPAA or (ii) a finding or stipulation that the other party has violated any standard or requirement of HIPAA or other security or privacy laws is made in any administrative or civil proceeding in which the party has been joined.

       d.    <u>Effect of Termination</u>. Upon termination of this Addendum for any reason, Business Associate shall return or destroy all PHI received from CE (or created or received by Business Associate on behalf of CE) that Business Associate still maintains in any form, and shall retain no copies of such PHI or, if return or destruction is not feasible, it shall continue to extend the protections of this Addendum to such information, and limit further use of such PHI to those purposes that make the return or destruction of such PHI infeasible.

5.    <u>Certification</u>. To the extent that both parties agree that such examination is required for CE to comply with its legal obligations pursuant to HIPAA relating to certification of its security practices, CE or its authorized agents or contractors, may, upon no less than ten (10) days prior written notice and at CE's expense, examine Business Associate's facilities, systems, procedures and records as may be necessary for such agents or contractors to certify to CE the extent to which Business Associate's security safeguards comply with HIPAA, the HIPAA Regulations or this Addendum.

6.    <u>Amendment to Comply with Law</u>. The parties acknowledge that state and federal laws relating to electronic data security and privacy are rapidly evolving and that amendment of this Addendum may be required to provide for procedures to ensure compliance with such developments. The parties specifically agree to take such action as is necessary to implement the standards and requirements of HIPAA, the HIPAA Regulations, HITECH and other applicable laws relating to the security or confidentiality of PHI. The parties understand and agree that CE must receive satisfactory written assurance from Business Associate that Business Associate will adequately safeguard all PHI that it receives or creates pursuant to this Addendum. Upon CE's request, Business Associate agrees to promptly to enter into negotiations with CE concerning the terms of an amendment to this Addendum embodying written assurances consistent with the standards and requirements of HIPAA, the HIPAA Regulations, HITECH or other applicable laws.

7.    <u>Assistance in Litigation or Administrative Proceedings</u>. Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under this Agreement, available to CE to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against CE, its directors, officers or employees based upon claimed violation of HIPAA, the HIPAA Regulations, HITECH or other applicable laws relating to security and privacy, except where Business Associate or its subcontractor, employee or agent is a named adverse party. CE shall pay or reimburse Business Associate for its reasonable costs in assisting CE as aforesaid, provided that neither Business Associate, nor its subcontractors, employees, or agents are named as adverse parties to any such proceeding.

8.     No Third Party Beneficiaries.  Nothing express or implied in this Addendum is intended to confer, nor shall anything herein confer, upon any person other than CE, Business Associate and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

9.     Interpretation.  This Addendum and the Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA, HIPAA Regulations, HITECH and applicable state laws.

10.     Counterparts.  This Addendum may be executed in counterparts, by manual or facsimile signature, each of which will be deemed an original and all of which together will constitute one and the same instrument.

11.     Survival.  The obligations of the Business Associate under Section 4.d. of this Addendum shall survive the termination of this Addendum.

12.     Relationship of Parties.  None of the provisions of this Addendum shall be deemed or construed to create any relationship between the parties hereto other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Addendum.

13.     Notice.  Any notice which may be required to be given hereunder shall be in writing and delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, or sent by overnight delivery service by a nationally recognized air courier, such as, but not limited to Federal Express or UPS, addressed as follows:

If to Business Associate:     Bruce Johnson
                              President and CEO
                              Illinois Primary Health Care Association
                              500 S. 9th Street
                              Springfield, IL  62701


With a copy to:               Robert M. Birndorf, Esq.
                              Law Offices of Robert M. Birndorf
                              200 W. Madison St., Suite 2670
                              Chicago, IL 60606


If to CE:                     _____
                              _____
                              _____
                              _____


Or to such other addresses as either party shall have designated by notice to the other.

        Notices mailed by registered or certified mail shall be effective three (3) business days after the date of mailing.  Notices sent by nationally recognized air courier shall be effective the next business day after the date of mailing.

The parties agree that any ambiguity in this Addendum shall be resolved in favor of a meaning that complies with and is consistent with HIPAA, the HIPAA Regulations and HITECH.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the Addendum Effective Date.

ILLINOIS PRIMARY HEALTH                    MEMBER (CE)
CARE ASSOCIATION, an Illinois not-for-profit
corporation (Business Associate)

**Exhibit C**

ETHICS RESPONSIBILITY RIDER

This Ethics Responsibility Rider ("**Rider**") is made a part of the agreement and all amendments, supplements, addenda and exhibits thereto (collectively, the "**Agreement**") entered into by and between CQuest America, Inc., an Illinois not-for-profit corporation ("CQuest") and/or Illinois Primary Health Care Association, an Illinois not-for-profit corporation ("**IPHCA**"), and Yahasoft, Inc., a Georgia business corporation ("**Contractor**"), and is effective as of the effective date of the Agreement.

Illinois has enacted amendments to Article 50 of the Illinois Procurement Code, Procurement Ethics and Disclosure (30 ILCS 500/50 et seq.) which prohibit or otherwise affect certain communications and business activities between contractors and the State of Illinois. Section 50-10.5, entitled "Prohibited Bidders and Contractors", generally disqualifies persons or businesses from entering into a contract with the State where either has assisted the State by reviewing, drafting or preparing any invitation for bids, a request for proposal or request for information or similar assistance. Section 50-39, entitled "Procurement Communications Reporting Requirement", generally provides that written or oral communications received by a State employee that imparts or requests material information or makes a material argument regarding potential action concerning a procurement matter must be reported to the State's Procurement Policy Board, and thereafter shall be publically reported. Contractor acknowledges that the summaries of the legislation contained in this Rider are for information and convenience purposes only, and that Contractor is responsible for knowing compliance with all relevant provisions of the above amendments.

Contractor hereby agrees that it will not directly or indirectly engage in any communications with the State of Illinois which are prohibited by or otherwise the subject of the provisions of Sections 50-10.5 or 50-39 referenced above without the prior written consent of the Chief Financial Officer of either IPHCA or CQuest pursuant to the Agreement. Contractor further acknowledges that any violation

27

of Contractor's responsibilities as provided herein shall subject Contractor to the immediate termination of the Agreement, as well as to injunctive relief, damages and other remedies as provided by law.

IN WITNESS WHEREOF, the parties have duly executed this Ethics Responsibility Rider as of the day and year first above written.

☐ Illinois Primary Health Care Association,      Contractor
     an Illinois not-for-profit Corporation

By: _____      By: _____

Name: _____      Name: _Roy Su_____

Title: _____      Title: _president_____

Date _____      Date _5/25/11_____

OR

☒ CQuest America, Inc.,
     an Illinois Not-for-Profit Corporation

By: _____

Name: Jeffrey H. Hamrick

Title: Chief Executive Officer

Date _5-25-11_____

28

**Exhibit D**

# DEPARTMENT OF HUMAN SERVICES
## STANDARD CERTIFICATIONS

Vendor acknowledges and agrees that compliance with this section and each subsection for the term of the contract and any renewals is a material requirement and condition of this contract. By executing this contract Vendor certifies compliance with this section and each subsection and is under a continuing obligation to remain in compliance and report any non-compliance.

This section, and each subsection, applies to subcontractors used on this contract. Vendor shall include these Standard Certifications in any subcontract used in the performance of the contract using the Standard Subcontractor Certification form provided by the State.

If this contract extends over multiple fiscal years including the initial term and all renewals, Vendor and its subcontractors shall confirm compliance with this section in the manner and format determined by the State by the date specified by the State and in no event later than July 1 of each year that this contract remains in effect.

If the Parties determine that any certification in this section is not applicable to this contract it may be stricken without affecting the remaining subsections.

5.1 As part of each certification, Vendor acknowledges and agrees that should Vendor or its subcontractors provide false information, or fail to be or remain in compliance with the Standard Certification requirements, one or more of the following sanctions will apply:
- the contract may be void by operation of law,
- the State may void the contract, and
- the Vendor and it subcontractors may be subject to one or more of the following: suspension, debarment, denial of payment, civil fine, or criminal penalty.

Identifying a sanction or failing to identify a sanction in relation to any of the specific certifications does not waive imposition of other sanctions or preclude application of sanctions not specifically identified.

5.2 Vendor certifies it and its employees will comply with applicable provisions of the U.S. Civil Rights Act, Section 504 of the Federal Rehabilitation Act, the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.) and applicable rules in performance under this contract.

5.3 Vendor certifies it is not in default on an educational loan (5 ILCS 385/3). This applies to individuals, sole proprietorships, partnerships and individuals as members of LLCs.

5.4 Vendor (if an individual, sole proprietor, partner or an individual as member of a LLC) certifies it has not received an (i) an early retirement incentive prior to 1993 under Section 14-108.3 or 16-133.3 of the Illinois Pension Code, 40 ILCS 5/14-108.3 and 40 ILCS 5/16-133.3, or (ii) an early retirement incentive on or after 2002 under Section 14-108.3 or 16-133.3 of the Illinois Pension Code, 40 ILCS 5/14-108.3 and 40 ILCS 5/16-133, (30 ILCS 105/15a).

5.5 Vendor certifies it is a properly formed and existing legal entity (30 ILCS 500/1.15.80, 20-43); and as applicable has obtained an assumed name certificate from the appropriate authority, or has registered to conduct business in Illinois and is in good standing with the Illinois Secretary of State.

5.6 To the extent there was an incumbent Vendor providing the services covered by this contract and the employees of that Vendor that provide those services are covered by a collective bargaining agreement, Vendor certifies (i) that it will offer to assume the collective bargaining obligations of the prior employer, including any existing collective bargaining agreement with the bargaining representative of any existing collective bargaining unit or units performing substantially similar work to the services covered by the contract subject to its bid or offer; and (ii) that it shall offer employment to all employees currently employed in any existing bargaining unit performing substantially similar work that will be performed under this contract (30 ILCS 500/25-80). This does not apply to heating, air conditioning, plumbing and electrical service contracts.

**5.7** Vendor certifies it has not been convicted of bribing or attempting to bribe an officer or employee of the State of Illinois or any other State, nor has Vendor made an admission of guilt of such conduct that is a matter of record (30 ILCS 500/50-5).

**5.8** If Vendor has been convicted of a felony, Vendor certifies at least five years have passed after the date of completion of the sentence for such felony, unless no person held responsible by a prosecutor's office for the facts upon which the conviction was based continues to have any involvement with the business (30 ILCS 500/50-10).

**5.9** If Vendor, or any officer, director, partner, or other managerial agent of Vendor, has been convicted of a felony under the Sarbanes-Oxley Act of 2002, or a Class 3 or Class 2 felony under the Illinois Securities Law of 1953, Vendor certifies at least five years have passed since the date of the conviction.   Vendor further certifies that it is not barred from being awarded a contract and acknowledges that the State shall declare the contract void if this certification is false (30 ILCS 500/50-10.5).

**5.10** Vendor certifies it is not barred from having a contract with the State based on violating the prohibition on providing assistance to the state in identifying a need for a contract (except as part of a public request for information process) or by reviewing, drafting or preparing solicitation or similar documents for the State (30 ILCS 500/50-10.5e).

**5.11** Vendor certifies that it and its affiliates are not delinquent in the payment of any debt to the State (or if delinquent has entered into a deferred payment plan to pay the debt), and Vendor and its affiliates acknowledge the State may declare the contract void if this certification is false (30 ILCS 500/50-11) or if Vendor or an affiliate later becomes delinquent and has not entered into a deferred payment plan to pay off the debt (30 ILCS 500/50-60).

**5.12** Vendor certifies that it and all affiliates shall collect and remit Illinois Use Tax on all sales of tangible personal property into the State of Illinois in accordance with provisions of the Illinois Use Tax Act (30 ILCS 500/50-12) and acknowledges that failure to comply can result in the contract being declared void.

**5.13** Vendor certifies that it has not been found by a court or the Pollution Control Board to have committed a willful or knowing violation of the Environmental Protection Act within the last five years, and is therefore not barred from being awarded a contract (30 ILCS 500/50-14).

**5.14** Vendor certifies it has not paid any money or valuable thing to induce any person to refrain from bidding on a State contract, nor has Vendor accepted any money or other valuable thing, or acted upon the promise of same, for not bidding on a State contract (30 ILCS 500/50-25).

**5.15** Vendor certifies it is not in violation of the "Revolving Door" section of the Illinois Procurement Code (30 ILCS 500/50-30).

**5.16** Vendor certifies that it has not retained a person or entity to attempt to influence the outcome of a procurement decision for compensation contingent in whole or in part upon the decision or procurement (30 ILCS 500/50-38).

**5.17** Vendor certifies it will report to the Illinois Attorney General and the Chief Procurement Officer any suspected collusion or other anti-competitive practice among any bidders, offerors, contractors, proposers or employees of the State (30 ILCS 500/50-40, 50-45, 50-50).

**5.18** In accordance with the Steel Products Procurement Act, Vendor certifies steel products used or supplied in the performance of a contract for public works shall be manufactured or produced in the United States, unless the executive head of the procuring agency grants an exception (30 ILCS 565).

**5.19** a) If Vendor employs 25 or more employees and this contract is worth more than $5000, Vendor certifies it will provide a drug free workplace pursuant to the Drug Free Workplace Act.
b) If Vendor is an individual and this contract is worth more than $5000, Vendor shall not engage in the unlawful manufacture, distribution, dispensation, possession or use of a controlled substance during the performance of the contract (30 ILCS 580).

30

**5.20** Vendor certifies that neither Vendor nor any substantially owned affiliate is participating or shall participate in an international boycott in violation of the U.S. Export Administration Act of 1979 or the applicable regulations of the U.S. Department of Commerce. This applies to contracts that exceed $10,000 (30 ILCS 582).

**5.21** Vendor certifies it has not been convicted of the offense of bid rigging or bid rotating or any similar offense of any state or of the United States (720 ILCS 5/33 E-3, E-4).

**5.22** Vendor certifies it complies with the Illinois Department of Human Rights Act and rules applicable to public contracts, including equal employment opportunity, refraining from unlawful discrimination, and having written sexual harassment policies (775 ILCS 5/2-105).

**5.23** Vendor certifies it does not pay dues to or reimburse or subsidize payments by its employees for any dues or fees to any "discriminatory club" (775 ILCS 25/2).

**5.24** Vendor certifies it complies with the State Prohibition of Goods from Forced Labor Act, and certifies that no foreign-made equipment, materials, or supplies furnished to the State under the contract have been or will be produced in whole or in part by forced labor, or indentured labor under penal sanction (30 ILCS 583).

**5.25** Vendor certifies that no foreign-made equipment, materials, or supplies furnished to the State under the contract have been produced in whole or in part by the labor or any child under the age of 12 (30 ILCS 584).

**5.26** Vendor certifies that it is not in violation of Section 50-14.5 of the Illinois Procurement Code (30 ILCS 500/50-14.5) that states: "Owners of residential buildings who have committed a willful or knowing violation of the Lead Poisoning Prevention Act (410 ILCS 45) are prohibited from doing business with the State until the violation is mitigated".

**5.27** Vendor warrants and certifies that it and, to the best of its knowledge, its subcontractors have and will comply with Executive Order No. 1 (2007). The Order generally prohibits Vendors and subcontractors from hiring the then-serving Governor's family members to lobby procurement activities of the State, or any other unit of government in Illinois including local governments if that procurement may result in a contract valued at over $25,000. This prohibition also applies to hiring for that same purpose any former State employee who had procurement authority at any time during the one-year period preceding the procurement lobbying activity.

**5.28** Vendor certifies that information technology, including electronic information, software, systems and equipment, developed or provided under this contract will comply with the applicable requirements of the Illinois Information Technology Accessibility Act Standards as published at www.dhs.state.il.us/iitaa. (30 ILCS 587)

**5.29** Vendor certifies that it has read, understands, and is in compliance with the registration requirements of the Elections Code (10 ILCS 5/9-35) and the restrictions on making political contributions and related requirements of the Illinois Procurement Code (30 ILCS 500/20-160 and 50-37). Vendor will not make a political contribution that will violate these requirements. These requirements are effective for the duration of the term of office of the incumbent Governor or for a period of 2 years after the end of the contract term, whichever is longer.

In accordance with section 20-160 of the Illinois Procurement Code, Vendor certifies as applicable:

☐ Vendor is not required to register as a business entity with the State Board of Elections.

Or

☐ Vendor has registered **and has attached a copy** of the official certificate of registration as issued by the State Board of Elections. As a registered business entity, Vendor acknowledges a continuing duty to update the registration as required by the Act.

31

**Exhibit E**

CONFIDENTIALITY AGREEMENT

This Agreement is entered into as of the effective date of this contract by and between CQuest America Inc. ("**CQuest**"), an Illinois not-for-profit corporation, with offices located at 500 South 9th Street, Springfield, Illinois 62701, and Yahasoft, Inc. ("**Contractor**"), 5696 Peachtree Parkway, Suite A, Norcross, Georgia 30092.

WHEREAS, during the course of engaging Contractor to provide consulting services for CQuest, CQuest will provide Contractor with certain information which CQuest regards as confidential and proprietary; and

WHEREAS, Contractor agrees to treat all such information as confidential and proprietary in accordance with the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual benefits to each party arising out of their business relationship, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties agree as follows:

1.    In consideration of, and as a prerequisite to the delivery of information by CQuest to Contractor, including without limitation, Requests for Proposal, business and strategic plans, teaming agreements, business strategies, financial and accounting documents, technical specifications, data models and the like, Contractor will consider and treat any and all such information provided by CQuest as proprietary and confidential material and agree to hold in confidence all such information which is disclosed to Contractor in writing, orally, or by observation.

2.    Contractor agrees not to disclose information received from CQuest to any third party, employee, or agent who does not have cause to know of such information.  Contractor further agrees that all persons who shall handle and receive such information shall be familiar with the terms of this Agreement and shall be bound to the terms hereof by executing an Acknowledgment on the form attached hereto as Exhibit E-1, which Contractor shall promptly deliver to CQuest.  Except as herein provided, Contractor agrees not to disclose the information to any other person or party without CQuest's prior written consent.

3.    Contractor agrees that all documents and information provided by CQuest shall be retained in and shall not be removed from Contractor's offices without CQuest's prior written consent, and that Contractor shall not make or cause to be made any copies of the documents or information so delivered without CQuest's prior written consent.

4.    Contractor agrees that any information obtained from CQuest shall not be sold or otherwise transferred, and that Contractor shall not gain any proprietary interest in or ownership of the information provided.  Contractor shall use the information and material provided by CQuest only in connection with the course of dealings between the parties.  Under no circumstances shall Contractor use the information to the detriment of CQuest or any of its affiliates.  At the conclusion of Contractor's work, or at any time upon CQuest's request, Contractor shall promptly return and deliver and cause its employees, agents or representatives to deliver to CQuest all written material which may contain or reflect any confidential information, whether prepared by CQuest, Contractor or otherwise.

5.    Contractor acknowledges that the breach of the terms and conditions hereof by it may result in irreparable damage to CQuest, which may not be adequately compensated by the payment of

money damages. Accordingly, CQuest may seek and obtain injunctive relief against Contractor for any breach or threatened breach of this Agreement, in addition to any other legal remedies which may be available. Contractor will hold harmless and defend CQuest against any claims, losses and damages resulting from the breach of any term or condition herein by Contractor.

6.    If Contractor, its representatives, agents or anyone to whom information is transmitted pursuant to this Agreement receives a request to disclose all or part of the information or to take any other action prohibited by this Agreement, pursuant to a valid and effective subpoena, civil investigative or discovery demand, interrogatories, request for information or production of documents, order of a court of competent jurisdiction or governmental entity or similar process, Contractor agrees to:  (i) immediately notify CQuest in writing of the existence, terms and circumstances surrounding such request, so that CQuest may seek a protective order or other appropriate remedy or waive compliance with this Agreement as to such information; and (ii) furnish only such information or take only such actions as is legally required and exercise reasonable efforts to obtain an order or other reasonable assurance that confidential treatment will be accorded any information so furnished.

7.    No failure or delay by CQuest in exercising any right, power or privilege hereunder shall operate as a waiver thereof as to Contractor, nor shall any single or partial exercise thereof preclude any other exercise of any right, power or privilege hereunder.

8.    If at any time subsequent to the date hereof any provision of this Agreement is held by a court of competent jurisdiction to be illegal, void or unenforceable, such provision shall have no effect upon and shall not impair the enforceability of and any other provision of this Agreement.

9.    This Agreement may be modified or waived only in writing signed by Contractor and CQuest, expressly stating such modification or waiver.

10.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties execute this Confidentiality Agreement as of the date first above written.

CQuest AMERICA INC.,
An Illinois Not-for-Profit Corporation

Contractor

By: _____

By: _____

Printed Name: Jeffrey H. Hamrick

Printed Name: _____Roy Su_____

Title:  Chief Executive Officer

Title: _____president_____.

33

**Exhibit E-1**

ACKNOWLEDGMENT

This Acknowledgment (this "**Acknowledgment**") is signed on this _25th_ day of _May_, 2011, by Roy Su ("**Recipient**"), for the benefit of CQuest America Inc. ("**CQuest**"), an Illinois not-for-profit corporation, with offices located at 500 South 9th Street, Springfield, Illinois 62701.

WHEREAS, Contractor is currently providing or may in the future provide consulting services to CQuest pursuant to an agreement between the parties;

WHEREAS, CQuest owns or possesses certain confidential information, as further described in the Confidentiality Agreement to which this Acknowledgment is attached, which confidential information is not available publicly and is unknown to the competitors of CQuest; and

WHEREAS, it may be appropriate or necessary, in connection with Contractor's provision to CQuest of services, for CQuest or Contractor to provide Recipient with access to such confidential information; and

WHEREAS, Contractor has agreed to disclose CQuest's confidential information only to any recipient of confidential information who (i) has a need to know the same to enable Contractor to perform its contractual obligations to CQuest and (ii) has executed an acknowledgment providing for the confidentiality of CQuest's confidential information and the assignment of any rights in work product developed by the employee in the course of the employee's work for CQuest;

NOW, THEREFORE, in consideration of the foregoing and of the employment of Recipient by Contractor to perform services to CQuest, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Recipient hereby agrees as follows:

1.      Recipient acknowledges that he has read and understands the Confidentiality Agreement, and agrees to protect CQuest's confidential information in accordance therewith. In particular, and without limiting the generality of the foregoing, Recipient agrees:

A.      to protect as confidential CQuest's confidential information;

B.      not to disclose CQuest's confidential information to any person or entity other than to other recipients of confidential information who have a need to know the same to enable Contractor to perform his contractual obligations to CQuest and are known by Recipient to have executed an acknowledgment, in the form of this Acknowledgment;

C.      not to copy any confidential information without the prior written consent of CQuest;

D.      not to use any confidential information other than for the benefit of CQuest;

E.      to return to CQuest all documents, drawings, reports and other tangible embodiments containing confidential information within three business days of his receipt of a request from CQuest to do so; and

F.      immediately to notify CQuest of any breach or suspected breach of the foregoing provisions of this section.

2.      Recipient acknowledges that CQuest will have a direct right to enforce the terms of this Acknowledgment against Recipient in the event that Recipient breaches the terms of this

Acknowledgment.    Recipient understands that, in view of the highly confidential nature of the confidential information, it will be impossible to measure in money the damage which will be suffered by CQuest in the event that Recipient fails to comply with the requirements of this Acknowledgment. Accordingly, Recipient agrees that CQuest shall be entitled to injunctive or other equitable relief for any breach or threatened breach of this Agreement, in addition to any and all other rights which it may have at law or in equity.  Recipient further agrees to be responsible for any expenses (including reasonable attorney's fees) that CQuest may incur if it is obliged to enforce this Acknowledgment.

3.    This Acknowledgment supersedes any and all prior acknowledgments by Recipient with respect to the subject matter of this Acknowledgment.

RECIPIENT:

(Signature)

_Roy Su_

(Printed Name)

35

# EXHIBIT B



June 13, 2013

**VIA FEDERAL EXPRESS**

Roy Su
Yahasoft, Inc.
5696 Peachtree Parkway
Suite A
Norcross, GA 30092

Re:   <u>Notice of Termination of Software Services Agreement</u>

Dear Roy:

As you know, CQuest America, Inc. ("**CQuest**") and Yahasoft, Inc. ("**Yahasoft**") have previously entered into a Software Services Agreement as of June 1, 2011 (the "**Agreement**"). The Agreement provides that the Implementation Services specified in Exhibit A – Statement of Services will be completed by Yahasoft on or before June 30, 2012. See Section I.A. Yahasoft has failed to provide the Implementation Services required by the Agreement, and has further failed to provide CQuest with any useable work product to date despite the fact that CQuest has paid Yahasoft the sum of $540,000. Yahasoft is in material breach of the Agreement, and has also failed to cooperate with CQuest in CQuest's repeated efforts to resolve outstanding issues by way of an amendment to the Agreement. CQuest has suffered substantial damages, both monetary and non-monetary, as a result of Yahasoft's failure to perform its obligations under the Agreement.

You are hereby notified that CQuest is hereby terminating the Agreement effective June 30, 2013 as a result of Yahasoft's material breach of the Agreement, as well as pursuant to Section IV.A. of the Agreement which permits termination of the Agreement on fifteen (15) days' notice prior to the current June 30, 2013 Termination Date.

Given the termination of the Agreement, CQuest believes that it is now an opportune time to resolve all outstanding issues between the parties which relate to the Agreement and the parties' rights and obligations thereunder. These issues, which would be addressed and incorporated into a settlement agreement between the parties, include, without limitation:

- The resolution of all monetary / financial issues, and corresponding compensation to CQuest;
- The delivery to CQuest of all work product purchased pursuant to the Agreement;
- An agreement as to permissible future business activities, including non-competition and non-disparagement provisions;
- Agreed terms as to confidentiality of documents, information, and terms of settlement; and



- Full general mutual releases between the parties and all of their respective related and affiliated employees, agents, and entities.

Please contact me within ten (10) days of receipt of this letter to discuss a resolution of all outstanding issues upon termination of the Agreement as above set forth. Roy, I am truly hopeful that we can come to a mutually-agreeable solution without undue expense or delay.

Very Truly Yours,

H. Kevin Davis
Chief Executive Officer,
CQuest
500 South Ninth Street
Springfield, IL 62701