E-FILED
Wednesday, 29 June, 2016  01:22:44 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

CQUEST AMERICA, INC., an Illinois )
not-for-profit corporation, )
          )
      Plaintiff, )
          )    NO. 13-3349
      v. )
          )
YAHASOFT, INC., a Georgia business )
corporation, )
          )
      Defendant. )

OPINION

RICHARD MILLS, U.S. District Judge:

This is an action for breach of contract.

Pending before the Court is the Motion for Summary Judgment filed

by CQuest America, Inc.

Plaintiff CQuest America, Inc. and Defendant Yahasoft, Inc. entered

in to a contract wherein Yahasoft would develop and deliver software to

CQuest for its claim processing services.  The Plaintiff would pay the

Defendant a specified price.

The issues before the Court include whether there was breach of

contract; a modification of the contract; and, if so, whether there was a breach of the modified contract.

Each party alleges that the other breached the contract and/or the modified contract.

This action was filed in the Seventh Judicial Circuit of Illinois, Sangamon County, and removed to this Court. Because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, the Court has jurisdiction over the subject matter. See 28 U.S.C. § 1332(a).

## I. FACTS

### A. Timeline of events

(1)

Jeffrey "Jeff" Hamrick served as the Chief Executive Officer of Plaintiff CQuest America, Inc. between May of 2011 and March of 2012. Kevin Davis has been the Plaintiff's CEO since August of 2012. Tom Hwang has been CQuest's Vice-President of Centralized Billing Services since 2009. Hwang was involved with the project at issue as a project

advisor.

On April 29, 2011, the Plaintiff entered into a contract ("the EI Contract") with the State of Illinois Department of Human Services (DHS) to provide billing functions for the Department's Bureau of Early Intervention. The EI Contract was for fiscal year 2011 (July 1, 2011 through June 30, 2012) and was renewable twice at DHS's option. The EI Contract and its renewals terminated on June 30, 2014.

Defendant Yahasoft is a software development company based in Atlanta, Georgia. Before entering in to a contract, Tom Hwang reached out to the Defendant's President and CEO, Qingyi ("Roy") Su, in February of 2011 to ask if he was interested in talking to CQuest about Yahasoft's early intervention data system. Su informed Hwang he would be interested in doing so.

On or about June 1, 2011, CQuest entered in to the Software Services Agreement (SSA) with Yahasoft. Yahasoft has developed a proprietary software system known as the Yahasoft Early Intervention Data System ("YEIDS"). YEIDS is a database designed to integrate collection, case

management, billing and claims processing for early intervention and early childhood special education state-based systems.  It can be customized and tailored for an individual and state's early intervention program.

The stated purpose of the SSA was for Yahasoft to build a "back end" system so CQuest could continue to provide billing services for the Bureau of Early Intervention.  "Front end" and "back end" are technical terms which describe software functions as those functions relate to the user of the software.  "Front end" services or functions are those with which the user of the software interacts directly–for example, a screen with fields into which a user enters data.  "Back end" services or functions are those with which the user does not interact directly, but which serve the front end–for example, a database in which data is stored once the user has entered that data into the front end, or a function which analyzes or processes the data which the user entered into the front end.  YEIDS comprises both a front end and a back end system.

The Plaintiff alleges it did not need a system with a front end, as it was already using the front end software provided by DHS, which was

called "Cornerstone." The Defendant disputes this and claims that almost from the outset, CQuest was interested in the possibility of developing a software package that would include front-end services.

The SSA does not provide for Yahasoft to develop a front end system. Yahasoft claims the SSA was modified orally and by performance to include front end functions as well.

The SSA requires Yahasoft to customize its existing software system to provide back end functions. A statement of services which described the back end functions was attached to the SSA as Exhibit A. Examples of the back end functions identified in the Statement of Services in the SSA include:

i.      "Support data interface functions with CARS,"

ii.     "Support data interface with Cornerstone,"

iii.    "Support data interface with Department of Healthcare and Family Services,"

iv.     "Modifications or additions to the YahaSoft data reporting system as required by DHS," and

5

v.    "Modification to the YahaSoft claims processing system as required

by DHS."

Once Yahasoft built the back end system, it was to provide maintenance

services for the completed system as well.

(2)

On June 6, 2011, Roy Su provided CQuest via email with a proposed

Project Schedule for "back end" work as described in the Statement of

Services.   The email was sent to Tom Hwang, Kim Wallace and Jeff

Hamrick.  On June 6, 2011, Tom Hwang received an email from Su with

an attached document purporting to be a draft project schedule for the

CQuest/Yahasoft project.  On June 21 and 22, 2011, Nan Slaughter, the

director of Yahasoft products and services, demonstrated the whole YEIDS

system (back-end and front-end functions) to DHS leaders including Janet

Gully, IL EI's Bureau Chief, at CQuest's office in Springfield, Illinois.

On July 5, 2011, Hwang received an email from Su with an attached

document regarding the system which the parties had contracted for

Yahasoft to build.  The document was entitled "Justification on Why

Illinois Early Intervention Cannot Just Use CBO Functions in Yahasoft Early Intervention Data System (YEIDS)." The way that YEIDS was designed, the back-end functions included more than just the Illinois CBO (Central Billing Office) function, which was the function then provided by CQuest to IL EI.

Tom Hwang's understanding from Su's July 5, 2011 email and document was Yahasoft could not build a back-end only system and that for CQuest to receive a back end system, it would have to accept front end functions as well. Su stated that he did not intend to imply that Yahasoft could not build a back-end only system. Yahasoft asserts that while it is entirely possible to build a back-end system that included the CBO function, the YEIDS design included other sophisticated back-end functions that were not a part of CQuest's preexisting back-end system. CQuest disputes this allegation.

Yahasoft asserts that although the SSA and IL EI contract only required it to build a back-end system, CQuest's intention from the beginning was to build the entire YEIDS system (back-end and front-end

7

functions) for Illinois.  The problem was that if CQuest was to build the back-end system first and Illinois later wanted to implement the front-end functions as well, CQuest would have to rebuild the entire system again. CQuest disputes this and notes that the SSA contains an integration clause which provides that the agreement constitutes the parties' entire agreement. The SSA would have reflected that CQuest wanted to build the entire YEIDS system if that was its intent.

On August 1, 2011, Kim Wallace of CQuest emailed Hamrick, Hwang, Slaughter and Su, summarizing a conversation she had with Gully and stating that JoAnne Durkee of DHS was implementing the whole YEIDS system.  Additionally, the email stated that DHS Assistant Secretary Grace Ho had requested that Yahasoft perform a demonstration of the entire YEIDS system.   On September 10, 2011, Yahasoft members Slaughter and Cameron demonstrated the whole YEIDS system to DHS personnel in Chicago, Illinois.

On October 20, 2011, Jeff Hamrick sent Janet Gully a letter stating that "CQuest is now in a position to implement the entire YEIDS system

for the Bureau of Early Intervention to allow the Bureau to take advantage of the most current technology with a state of the art Early Intervention data system."

(3)

On October 21, 2011, Hamrick emailed Su and asked if Su was available for a conference call on Friday, October 28, 2011 at 3:00 p.m. eastern time.  Su responded to Hamrick's email by stating that he would call him on October 28, 2011 at 3:00 p.m.

CQuest still wanted the back end system for which it had bargained in the SSA.  CQuest alleges that, in order to receive the back end system for which it had bargained in the SSA and to meet its contractual commitment to DHS, CQuest had to acquiesce to Yahasoft building a system which entailed both back end and front end functions as well.  Yahasoft disputes the previous statement on the basis that the SSA was modified at CQuest's request, after CQuest expressed a strong interest in having the capability to provide a fully integrated system to the State, especially after State officials responded positively to a demonstration of the full system.

CQuest asserts that based on Yahasoft's representations that it could not build a back-end only system, CQuest's personnel worked with officials at the DHS Bureau of Early Intervention to gain those officials' provisional approval of Yahasoft's front end and back end integrated system.  Yahasoft disputes the allegation on the same basis and claims that CQuest was interested in the full system from the beginning.

On November 14, 2011 Hwang, Hamrick and Wallace met with Slaughter and Su to prepare for the project kickoff meeting with Bureau of Early Intervention personnel.  They later met with Bureau of Early Intervention personnel, including Gully, to introduce the YEIDS system. On November 15, 2011, the parties reconvened to review and record the Bureau of Early Intervention's proposed changes to YEIDS's initial four front-end functions, including Demographic Screen, Referral Screen, Parent Screen and Financial Support Screen.  They agreed to continue the conversation in the coming weeks.

In January of 2012, CQuest contracted with a local consulting firm, Marucco, Stoddard, Ferenbach & Walsh, Inc. ("MSFW") to engage a

project manager to manage the project on CQuest's behalf.  The MSFW project manager, along with other CQuest employees, was available to Yahasoft by telephone, email, and in weekly and sometimes bi-weekly "progress meetings" held via web-conferencing software to discuss the process of implementing the front-end and the back-end system of YEIDS and the changes that needed to be made or were being made for incorporation into IL EI.  Between January 2012 and the end of May 2012, Hwang received via email twelve versions of a project charter from Mary Ann Hedlund, the project manager.  The changes in the project charters were not final and were ongoing.  The name of the project changed from EICBO (which only incorporated the CBO back-end functions) to IEIS (which incorporated both the front-end and the back-end functions).  The name change reflected the change in the scope of the original project.  The material provisions in the project charters did not undergo any substantive changes.

The first version of the Project Charter, under Project Overview, contains the following statements:

11

The current Illinois Early Intervention data management system (Cornerstone) is more than 10 years old. The system was not designed specifically for Early Intervention and has not evolved to meet the demands of an increasingly data dependent federal program. The structure, age and design of the current Illinois' Early Intervention system does not allow for "real time" data collection analysis and use. The current server based system requires nightly uploads to a central server. The delay in data collection makes it difficult to meaningfully use the data at a local level.

The Illinois Part C Early Intervention Task Force has recommended that the Bureau of Early Intervention design and implement a web-based data management system to solve these concerns. The Bureau of Early Intervention has therefore contacted the EI Central Billing Office to provide a solution. The proposed solution is to purchase and customize Yahasoft Early Intervention Data System (YEIDS), which has been implemented and proven in both Tennessee and Kentucky. The new system will be called the Illinois Early Intervention System (IEIS).

The final version of the project charter contains a substantially similar project overview statement.

In each project charter, the key project objectives were stated as: (1) implement a single statewide web-based data management system customized for the Illinois Bureau of Early Intervention; and (2) provide a comprehensive Early Intervention system integrating both case management [front-end functions] and claims management [part of the

back-end functions].  Each project charter extended the project timeline to June 30, 2013.  Each project charter, under project assumptions, states that "IEIS will replace Cornerstone for Early Intervention case management."

CQuest states that it fulfilled its other obligations under the SSA. Yahasoft alleges that Plaintiff stopped paying for services rendered in March of 2012.  At the time, revisions in the project charters were ongoing and continued to May of 2012.  As of March of 2012, the project charter showed that design and development of the project would continue to December 15, 2012, with a project completion date of June 30, 2013.

(4)

On June 14, 2012, Kim Wallace sent a letter to Yahasoft that stated the IEIS project must be completed no later than October 1, 2013.  The letter (which is dated June 15, 2012) concluded by stating, "We continue to believe that the CQuest/Yahasoft team can deliver an extraordinary solution to the Illinois Early Intervention Program."

Roy Su created a memorandum on or about July 3, 2012.  As of July 3, 2012, Su thought CBO (i.e., back end) discovery was 20 to 40 percent

13

complete.  Su thought CBO design and development was 20 to 30 percent

complete.  Su did not know where the "January 29" deadline mentioned in

his July 3 memorandum came from.[1]

Kevin Davis received a letter from the general counsel for DHS on or

about August 10, 2012.  Upon receiving the letter, Davis forwarded the

letter to Roy  Su.  The letter stated in part:

It has come to the attention of the Illinois Department of
Human Services (Department) that CQuest has been working

_____

[1]The memorandum, which refers to "January 29" in two different
paragraphs, states in part:

It is realistic to believe we (EI program as customer, CQuest project
staff, Yahasoft project staff) can make the January 29th
development deadline, if we commit to an intensified work plan
and schedule, i.e. including tasks and deadlines every other week.
*Roy: maybe all of the CBO development does not have to be done
by 1/29–can we revisit when/how to test CBO functionality and
revise project schedule?

Yahasoft must be exposed to (and understand) the breadth and
depth of CBO functionality ASAP.

CQuest needs confirmation that Yahasoft can build and implement
the CBO functionality that is within project scope.  Do we need to
see a prototype?

What Should We Do?

Create detailed workplan to/through Jan. 29[.]

to expand the Yahasoft Early Intervention Data System (YEIDS) on behalf of the Bureau of Early Intervention. While the Department appreciates CQuest's offer to provide these services at no cost, the Department already has a vendor who handles the "front-end" business services for our clients. At this time, the Department must decline any expanded services for the YEIDS that are covered by the Department's current contract with your company and ask that the expansion project stop as of the date of this letter.

Davis understood the letter to mean DHS did not need and was not looking for a new "front end" system or a new system which integrated front end and back end functions. Based on the letter, Davis wanted to either amend the terms of the SSA with Su or re-direct the project to complete the back end system per the SSA. On September 4, 2012, Davis sent a memo to Yahasoft that noted CQuest was considering multiple options in light of the new development. CQuest "request[ed] a proposal from Yahasoft that describes and sets forth a plan to provide a solution" that included a number of critical functions identified in the memo.

On October 5, 2012, at Davis's request, Su submitted a proposal for Yahasoft to complete the "back- end" system now called EIBOSS. EIBOSS was to materially perform the same back-end functions contemplated by the

15

SSA.

Roy Su's proposal indicated that the total implementation cost for EIBOSS would be $822,400. The proposal provided for a timeline of November 1, 2012 to June 30, 2014 to implement a back end system. When asked at his deposition, Su was unable to quantify how much of the back end work that was already performed could have been re-used on the EIBOSS project.

On October 18, 2012, Su also emailed Yahasoft's IKIDS (Illinois early Intervention Data System) proposal to Davis. The IKIDS proposal included both the front-end and the back-end system and the costs associated with developing the complete system. Yahasoft's EIBOSS and IKIDS proposals were both sent in response to CQuest's request.

On November 1, 2012, Kevin Davis responded to the IKIDS proposal by proposing a new time frame. Davis's response also proposed counter-payment terms and acknowledged that the total system was approximately 40% complete, with the front-end system approximately 70% complete and the back-end system approximately 10% complete.

16

On November 12, 2012, Roy Su responded to Davis's counterproposal in part by requesting payment by CQuest of Yahasoft's unpaid invoices, totaling $343,333.34.

On December 10, 2012, CQuest proposed that Yahasoft enter into a new Master Team Agreement and Nondisclosure Agreement for future cooperation between CQuest and Yahasoft to develop and implement the full YEIDS system in states other than Illinois.

On December 14, 2012, Davis sent a follow-up memo to Yahasoft detailing an approach to complete Yahasoft's IKIDS proposal. The memo restated once again that Davis was confident that both CQuest and Yahasoft would be able to come to mutually agreeable terms on the IKIDS system, thus building upon the parties' already strong relationship.

In December of 2012, Davis asked Su to perform a summary of the work the Defendant had performed under the SSA. Su provided Davis with the requested summary. Su does not think CBO (i.e., back end) discovery ever got to 80% completion.

On June 13, 2013, CQuest issued a Notice of Termination of the SSA

17

to Yahasoft. On August 21, 2013, the Plaintiff filed this lawsuit for breach of contract.

### B. Yahasoft's invoices

Yahasoft sent invoices to CQuest for work the Defendant purportedly performed every month between June of 2011 and August of 2012. The Plaintiff paid the Yahasoft's invoices for work that was purportedly performed each month between June of 2011 through March of 2012. CQuest stopped approving Yahasoft's invoices for payment in March of 2012.

CQuest claims it did not pay Yahasoft's invoices for April 2012, May 2012 or June 2012 because Yahasoft was not performing under the SSA and because the invoices did not specify what work Yahasoft purported to have performed. Yahasoft disputes the allegation by stating that its invoices in the three months prior to April 2012 followed the same format and were paid by CQuest. Moreover, the State did not question implementation of the full front and back end system until August of 2012.

CQuest alleges it did not pay Yahasoft's invoices for work purportedly

performed in July of 2012 or August of 2012 because such invoices relate to the maintenance period, as defined in the Pricing and Payment terms of the SSA and no such system had been delivered to the Plaintiff. Yahasoft disputes the assertion by claiming that the SSA and its timelines for completion had been modified by agreement and performance. Accordingly, the Defendant contends the dates set forth in the SSA no longer applied.

In August of 2013, CQuest received invoices from Yahasoft which purported to represent monthly work Yahasoft performed in September of 2012 and October of 2012. CQuest did not pay these invoices because, to CQuest's knowledge, Yahasoft performed no services under the SSA in September of 2012 or October of 2012, and the invoices did not specify what work was performed. Yahasoft disputes this by stating that its prior invoices, including invoices for January-March of 2012, following the same format and were paid by CQuest. During September and October of 2012, moreover, Yahasoft continued its performance and was in continued contact with CQuest and its project manager.

C. Purported October 28, 2011 conversation and email

On August 28, 2012, Kevin Davis received an email from Roy Su, which purported to be a forwarded copy of an email Su had sent to CQuest's former CEO, Jeff Hamrick, on October 28, 2011.  Su claims that in a conversation with Hamrick on October 28, 2011 at approximately 3:00 p.m., Hamrick agreed to expand the scope of the project to include developing the front-end system as well as the back-end system, extend the timelines for the project to June 30, 2013, as opposed to June 30, 2012, and, in return, extend the payment terms of the SSA to pay Yahasoft from June 1, 2011 to June 30, 2012 and $500,000 from July 1, 2012 to June 30, 2013.  CQuest disputes the assertions and alleges that Hamrick does not recall the conversation taking place.  Moreover, it was not Hamrick's practice to agree to such modifications over the phone.

Roy Su testified that he memorialized this conversation by sending an email to Hamrick on October 28, 2011 at 6:11 p.m.  Su admitted that besides the email, there is no written record that the conversation with Hamrick took place.  Yahasoft alleges that, although Hamrick did not

respond to the email, the parties' course of performance and the documents supporting the revised scope of the project demonstrate that Hamrick agreed to modify the SSA.  Each version of the project charter, which contains the modified terms of agreement, identifies Hamrick as the Project Sponsor.  CQuest disputes the allegation and Hamrick does not recall receiving the email.

Jeff Hamrick's job duties as CEO included negotiating and executing contracts.  Hamrick has examined the purported October 28, 2011 email. To the best of Hamrick's recollection, before meeting with CQuest's counsel on May 27, 2015, he had not previously seen the emailed allegedly sent on October 27, 2011.  Yahasoft disputes this and notes that based on the parties' subsequent performance, Hamrick did agree and must have reviewed the email.  Hamrick states that it was not his practice to delete important business-related emails.  It was Hamrick's practice to keep important business-related emails in his inbox until he had followed up on them.  Moreover, Hamrick states his practice was to follow up on important business-related emails within 24 hours of receiving them.  Hamrick

typically then saved the emails in specific designated folders.

CQuest alleges that, if Hamrick had received the purported October 28, 2011 email, he would have considered it to be an important business-related email and he would have replied to Roy Su. Su did not receive a reply. Yahasoft disputes the allegations and states further that, because Su's email correctly stated their agreement, their was no reason for Hamrick to reply. Moreover, the contract was amended by oral agreement and by the parties' course of performance. Accordingly, the lack of a response to Su's email is not material.

Kevin Davis has access to the CQuest email account for former CEO Jeff Hamrick. To Davis's knowledge, he is the only person with access to Hamrick's email account. Davis states he has not deleted, altered or modified any of the business-related emails in Jeff Hamrick's CQuest email account. Davis has reviewed the emails in Hamrick's email account from January of 2011 to August of 2012. The purported October 28, 2011 email from Roy Su does not appear in Hamrick's CQuest email account. Yahasoft disputes the allegation and notes Su testified that he prepared and

sent the email and then forwarded the email at a later date to other of CQuest's personnel, including Davis.

CQuest alleges that, to the best of Hamrick's recollection, he did not speak with Roy Su on October 28, 2011. As CEO, it was not Hamrick's practice to agree to contractual modifications over the telephone. Yahasoft disputes the allegations on the basis that Su has testified to the conversation and, based on the parties' subsequent performance, the conversation must have occurred.

CQuest further asserts Hamrick would not have agreed to modify or extend the payment terms of CQuest's contract with Yahasoft–or any contract–without first speaking to the Plaintiff's Executive Committee, its financial personnel and its operations personnel. Hamrick would not have agreed to modify the timetable of Yahasoft's performance or the scope of the Defendant's work without first consulting with CQuest's operations personnel. Moreover, Hamrick would not have orally agreed to modify the payment terms of CQuest's contract with Yahasoft without also modifying the terms in writing as required by the contract. Hamrick would not have

agreed to modify the timetable for Yahasoft's performance under the contract without also modifying the timetable in writing as required by the contract. Additionally, Hamrick would not have orally agreed to modify the scope of the Yahasoft's work under the contract without also modifying the scope of work in writing as required by the contract.

Yahasoft disputes the foregoing allegations and claims that, although the allegations are consistent with Hamrick's affidavit, the parties' subsequent performance demonstrates that Hamrick did agree to and did modify the terms. Each version of the project charter, which contains the terms of the agreement, identifies Hamrick as the project sponsor. Each project charter identifies Kevin Davis as the project director.

CQuest alleges Hamrick did not agree to modify or extend the payment terms of the contract. Hamrick did not agree to modify or extend the timetable for Yahasoft's performance or the scope of its work under the contract with CQuest. Yahasoft disputes these allegations based on subsequent performance as already noted.

Roy Su admitted that no one at CQuest other than Jeff Hamrick ever

24

confirmed that Yahasoft would be paid pursuant to an extended schedule if Yahasoft built both the back and front end system. Yahasoft disputes the allegation and states that Plaintiff continued to pay the Defendant through March of 2012, with full knowledge that the SSA had been modified to include a full integrated system. These continued payments, when CQuest was aware the scope of work and timeline had changed, provide further evidence of its agreement to the modification of the contract.

CQuest contends that, while Jeff Hamrick was its CEO on or about May of 2011 through June of 2012, at no time did he discuss with Kevin Davis having agreed to modify, modifying or having modified the payment terms or any other terms of the SSA. Yahasoft disputes the allegation and states that the contract was modified by agreement and performance. Moreover, internal discussions must have occurred at CQuest or no discussions were necessary as it was clear the timeline and scope of work had changed.

Roy Su admitted that he did not provide copies of all of his emails to CQuest in discovery, including the "original" of the October 28, 2011

email.  Kevin Davis received an email on August 28, 2012, which purported to be a forwarded copy of the email Su allegedly sent to Hamrick ten months earlier.

D. Defendant's "work product"

CQuest alleges that before this litigation, Yahasoft did not provide it with any work product–functioning or non-functioning.  Yahasoft responds by claiming that CQuest terminated the contract before it could complete performance.    Moreover,  Yahasoft  had  demonstrated  its  ongoing performance,  especially  during  project  meetings,  many  of  which  were conducted online with demonstrations of the performance to date.  CQuest neither sought nor expected a partial work product, which would not have been functional.

According to Tom Hwang, the "work product" that Yahasoft provided in the course of this litigation is not functional or usable.  Yahasoft alleges that  because  CQuest  terminated  the  contract  before  it  could  complete performance, Yahasoft does not have a full, completed, functional software system to provide to CQuest.

26

CQuest alleges that a complete, functioning "back end" system would include a source code, database schema, technical documentation and an "executable" in the form of a .dll file to permit the software to run. Yahasoft claims that several of those items are proprietary and would not have been received by CQuest.

Source code is a text-based compilation of commands or instructions which, when executed, constitute a computer program. A database schema is a formula or set of formulas which comprise the organizational structure of a database. Technical documentation is documentation which describes the architecture and functionality of a program.

CQuest alleges that an "executable" is a type of file which combines source code and database schema to permit a program to run. A .dll file is a type of executable though it cannot run on its own. It must refer to source code and databases to run and must be properly configured to run.

CQuest asserts that Yahasoft provided it with a PDF containing snippets of code, but did not provide the code in native form. From the PDF Yahasoft provided, it is not possible to determine whether or to what

extent Yahasoft actually modified or customized the code or wrote a new code. Yahasoft did not provide CQuest with any database schema, but instead provided a PDF file listing statements purportedly used to modify the schema. From the PDF the Defendant provided, it is not possible to determine whether or to what extent Yahasoft actually modified or customized the database schema or created any new database schema. CQuest further alleges that Yahasoft provided it with very little technical documentation. Yahasoft provided CQuest with an executable in the form of a .dll file, but did not provide any documentation to configure an environment so the Plaintiff could execute the .dll or a database or schema for the .dll to reference.

Yahasoft disputes these allegations and contends it provided documents responsive to CQuest's discovery requests, including database schema and executable .dll file and, had it been allowed to complete its performance under the contract, CQuest would have received a functioning software system.

CQuest alleges that it did not receive a functioning work product from

the Defendant.  An incomplete work product is of no use or value to the Plaintiff.   Yahasoft disputes these allegations and contends CQuest terminated the contract before Yahasoft could complete performance.

CQuest filed this breach of contract action, seeking damages in an amount in excess of $700,000 plus interest, attorney's fees and costs. Yahasoft's counterclaim seeks $760,000 plus interest, in addition to attorney's fees and costs.

## II. DISCUSSION

The Plaintiff contends that the Defendant breached the parties' contract by failing to perform its obligations under the SSA.  CQuest further alleges that Yahasoft's six affirmative defenses fail.

Yahasoft asserts that the oral agreement between CQuest's former CEO Hamrick and its CEO, Su, is valid and enforceable under Illinois law. Yahasoft contends the parties' subsequent course of performance constitutes additional consideration in support of the validity of the oral contract modification.

CQuest disputes that there was a valid modification of the SSA and

notes that unwritten modifications were not permitted.  Moreover, none of the thirteen versions of the project charter modified the SSA.  Yahasoft asserts that under Illinois law, the existence of the non-modification and non-waiver clauses does not preclude the validity of an orally modified contract under circumstances and, here, CQuest's conduct evinces waiver of the clauses.

CQuest further asserts that, even if the parties did modify the SSA to extend Yahasoft's time to perform and increase the scope of the project, Yahasoft still breached the contract as modified.  Yahasoft counters the allegation by claiming that CQuest breached the modified contract by terminating the modified contract before Yahasoft could complete its performance.

A. Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  The Court construes all inferences in favor of the non-movant.  See Siliven v.

Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011).  To

create a genuine factual dispute, however, any such inference must be based

on something more than "speculation or conjecture."  See Harper v. C.R.

England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).

Because summary judgment "is the put up or shut up moment in a lawsuit,"

a "hunch" about the opposing party's motives is not enough to withstand

a properly supported motion.  See Springer v. Durflinger, 518 F.3d 479,

484 (7th Cir. 2008).  Ultimately, there must be enough evidence in favor

of the non-movant to permit a jury to return a verdict in its favor.  See id.

B. Breach of contract

(1)

The SSA provides that the contract will be construed and interpreted

pursuant to Illinois law.  In Illinois, to establish a breach of contract, a

plaintiff must show: "(1) the existence of a valid and enforceable contract;

(2) substantial performance by the plaintiff; (3) a breach by the defendant;

and (4) resultant damages."  W.W. Vincent and Co. v. First Colony Life

Ins. Co., 351 Ill. App.3d 752, 759 (1st Dist. 2004).  Neither party disputes

31

that the parties entered in to a valid and enforceable contract.

CQuest claims it performed each of its obligations under the SSA, an allegation which Yahasoft disputes given that Plaintiff stopped paying Yahasoft for its services in March of 2012.  CQuest alleges that the reason it stopped approving the invoices is that the Defendant was not "specifying the services performed during the period, with specific reference to the Statement of Services," in violation of Section III(B)(i) of the SSA.  Section III(B)(i) further provided:

> Yahasoft shall maintain and provide to CQuest with each invoice Yahasoft's records of all services performed under this Agreement.  New screens and new processes to the database shall require Yahasoft to specify the number of hours worked, applicable rates, and services performed in Yahasoft's invoices to CQuest.

The invoices which cover the first few months–June, July, August, September, October and November of 2011–do list some of the tasks that Yahasoft performed in implementing YEIDS.  Beginning with the invoice received on January 6, 2012 for work performed in December of 2011 and continuing with the invoices covering work in January, February, March, April, May, June and July of 2012, no tasks performed by Yahasoft are

32

specified.   Those invoices simply say, "For Services Rendered on: Implementation of Yahasoft Early Intervention Data System (YEIDS) for Illinois Early Intervention Program."  Each of those eight invoices further notes the monthly period of performance and lists an amount due.

The same is true for invoices received in August of 2013, which purport to represent work performed in September of 2012 and October of 2012.

CQuest is correct that Yahasoft's invoices were entirely devoid of any description of the services that were performed during the months noted above.  In that respect, it appears that Yahasoft did violate the terms of the SSA.

Section III(A) of the SSA required CQuest to pay Yahasoft "for the performance of services under this Agreement."  Section III(B)(ii) states, "Within ten (10) business days of CQuest's receipt of payment from DHS for each monthly period, CQuest shall pay Yahasoft for corresponding approved invoices submitted to CQuest."   Section V(D) of the SSA provides, "All work will be done in a competent fashion in accordance with

applicable standards of the profession and all services are subject to final approval by a representative of CQuest prior to payment."

CQuest contends that based on the invoices that were submitted, it could not determine whether Yahasoft had performed any services. After approving the invoices from June of 2011 through March of 2012, therefore, CQuest stopped paying Yahasoft's alleged deficient invoices in April of 2012. CQuest contends it was within its rights to stop paying Yahasoft given that it could not approve invoices without knowing if Yahasoft had performed any services. Until this time, however, CQuest claims it fulfilled its main obligation by paying Yahasoft. Additionally, CQuest states that it fulfilled its other obligations.

CQuest acknowledges that it could have insisted from the time it received Yahasoft's first deficient notice that Defendant provide the kind of detail and support required by the SSA. By approving and paying several deficient notices, however, CQuest claims it did not waive its right not to approve and not to pay on later deficient invoices. Section VII(I) of the SSA is a non-waiver clause which provides:

> Failure by either party to this Agreement to insist in any one or more cases upon the strict performance of any of the terms, covenants, conditions, or provisions of this Agreement shall not be construed as a waiver or relinquishment of any such term, covenant, condition, or provision. No term or condition of this Agreement may be waived, modified, or deleted except by a written amendment signed by the parties hereto.

Illinois courts do enforce non-waiver clauses. See Roboserve, Inc. v. Kato Kagaku Co., Ltd., 78 F.3d 266, 277 (7th Cir. 1996). Non-waiver clauses "may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time." Id. (citing Transcraft Corp. v. Anna Indus. Dev. Corp., 223 Ill. App.3d 100, 103 (5th Dist. 1991)). Accordingly, CQuest contends that the non-waiver clause should be enforced.

Yahasoft acknowledges that non-waiver clauses are "strictly enforceable under Illinois law, though they may be waived by the words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence." PPM Finance, Inc. v. Norandal USA, Inc., 297 F. Supp.2d 1072, 1087 (N.D. Ill. 2004) (internal quotation marks and citation omitted).

The Court concludes that there is a factual dispute regarding whether CQuest performed its obligations. Although many of the invoices provided by Yahasoft did not appear to comply with the SSA, which required a greater degree of specificity, CQuest could have insisted that the work be itemized. In fact, Kevin Davis did ask Roy Su in December of 2012 to provide a summary of the work Yahasoft had performed under the SSA. Certainly, CQuest could have insisted on such detail beginning with the invoice received in January of 2012, which was the first that lacked any supporting documentation. All subsequent invoices were devoid of content. However, it does not appear that CQuest requested an itemization of work performed until December of 2012.

Nevertheless, the record shows that CQuest believed the parties had a strong relationship even in December of 2012. At that time, CQuest was interested in expanding that relationship and working with Yahasoft in developing and implementing the YEIDS system in other states.

The Court concludes that based on its deeds and actions, there is a factual dispute regarding whether CQuest waived reliance on the non-

36

waiver clause.   CQuest made payment initially despite the deficient invoices.  After withholding payment for several months on invoices that failed to describe the services performed, CQuest asked Yahasoft for a summary of the work in December of 2012.   By initially paying the deficient invoices without questioning the content and then withholding payment for several months before questioning the content–while still believing the parties had a strong relationship under the SSA–there are factual issues regarding whether either party performed each of its obligations under the SSA.

(2)

CQuest contends that, in addition to failing to properly invoice its work, Yahasoft violated the SSA in other ways.  Yahasoft did not perform its most important duties in failing to complete the "back end" functions.  Based on the information provided, CQuest alleges it is impossible to determine whether Yahasoft met its obligation under § V(D) to perform its work "in a competent fashion in accordance with applicable standards of the profession."

Roy Su's July 3, 2012 memorandum provided that "CBO ["back-end"] Discovery is 20-40% done," and that CBO Design and Development is approx. 20-30% done."  Thus, the back-end was not completed by June 30, 2012, as contemplated in the SSA.

CQuest further asserts that, in the October 5, 2012 "Cost Proposal for EIBOSS," Su proposed that CQuest pay more than $800,000 to Yahasoft for a back end system that was substantially similar to the back end system Yahasoft was supposed to have already built.  The timeline for implementing the system was November 1, 2012 to June 30, 2014 which, according to CQuest, tends to show that the back end system that was supposed to have been designed under the SSA was not close to being finished.

The December 21, 2012 memorandum from Yahasoft provides a summary of work performed from April 1, 2011, to August 31, 2012.  The memorandum states that work on "back end" functions has started and it notes some of the tasks that have been performed.  CQuest contends that the incomplete work product would have been of little or no value to it.  It

would not have been functional or usable.

(3)

"Oral modifications are permitted in Illinois, even if the contract contains a provision banning oral modifications."  R.T. Hepworth v. Dependable Ins. Co., 997 F.2d 315, 317 (7th Cir. 1993).  Accordingly, the fact that the SSA contained a clause prohibiting unwritten modifications does not alter the Court's inquiry.

"[A] valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration." Schwinder v. Austin Bank of Chicago, 348 Ill. App.3d 461, 468 (1st Dist. 2004).  "A modified contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract."  Id. at 469.  The modified contract thus creates "a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed."  Id.

39

The parties dispute whether there was an oral agreement between Jeff Hamrick and Roy Su on Friday, October 28, 2011 and, if so, whether such agreement was valid and enforceable under Illinois law, thus modifying the SSA.   Although Hamrick denies that the conversation took place on October 28, 2011 at 3:00 p.m., he had requested that Su call him precisely then because Hamrick was traveling Monday through Thursday that week. Su responded, "Jeff–Next Friday at 3PM (ET) will work for me.  I will give you a call at that time."  According to his October 20, 2011 email, Su wanted to meet with Hamrick to discuss how CBO works and how it could be designed into YEIDS.

Based on the foregoing, a telephonic appointment was made and there is nothing in the record tending to show that it was canceled or rescheduled or that either party failed to appear (except that Hamrick has no recollection of the conversation).   Accordingly, it appears that a conversation did take place.  At the very least, there is a factual dispute on the issue.

The parties dispute whether the "memorializing email" was sent by Su

to Hamrick on October 28, 2011 at 6:11 p.m.  Moreover, Su admitted that

besides the email, there is no written record that the phone conversation

took place.  Su did not provide copies of all of the emails to CQuest in

discovery, including what Yahasoft alleges is the original of the October 28,

2011 email, though Su testified this is because he assumed CQuest would

have already had the email in its possession.  Hamrick claims that, to the

best of his recollection, he never saw the email until it was shown to him in

the context of this litigation in May of 2015.

Yahasoft alleges that the email shows that during the telephone

conversation, Hamrick agreed to expand the scope of the CQuest/Yahasoft

project to include developing the front-end system as well as the back-end

system, to extend the payment terms to Yahasoft and pay Yahasoft

$800,000 for implementation from June 1, 2011 to June 30, 2012 and

$500,000 for implementation and maintenance from July 1, 2012 to June

30, 2013.  Yahasoft asserts that Su reasonably believes that CQuest had

always intended to implement the entire YEIDS system and thus had no

basis to question Hamrick's intention.  According to Yahasoft, this newly

modified contract did not defeat the general purpose of the original SSA, given that both documents served the purpose of implementing or integrating the YEIDS system to the IL EI system.

Yahasoft contends that the contract as modified was supported by consideration under Illinois law in that Yahasoft had taken on the additional task and responsibility of developing front-end functions that were not part of its original duties under the SSA. CQuest had incurred the benefit of acquiring the whole YEIDS system versus only the back-end system as bargained for in the SSA.

CQuest disputes that the email was sent by Su. Hamrick would not have deleted the email. Additionally, CQuest alleges Hamrick would have responded to the email and would not have agreed to contractual modifications over the phone–particularly modifications such as these which altered the payment terms.

CQuest asserts that except for Su's discredited testimony, there is no evidence that Hamrick agreed to extend the payment terms of the SSA as consideration for the expansion of the project. Moreover, even assuming

the conversation took place and Su sent the memorializing email, it is still not clear that Su and Hamrick agreed on anything. The email states that there was "no final decision" yet about implementing both the back end and front end functions of YEIDS. It does not state what front end functions Yahasoft would complete or when. Given the indefiniteness of the terms, the alleged amendment does not conflict with the SSA as far as Yahasoft's obligation to complete the back end functions by June 30, 2012. Accordingly, CQuest contends there was not an agreement to rescind the inconsistent term in the prior contract.

Yahasoft counters by alleging that the email modified the contract by setting forth clear and definite terms for three essential elements of the SSA: (1) the scope of the project; (2) the timeline of the project; and (3) the payment terms of the project.

The issue of whether the email was actually sent is indeed a curious one. Additionally, it does seem very unlikely that a contract of this magnitude would be amended in such an informal manner. When the evidence is viewed in a light most favorable to Yahasoft, however, the Court

concludes that the parties' subsequent course of conduct creates a question of fact regarding whether there was a contract modification.  Specifically, there is evidence in the record which suggests that the terms of the SSA were modified and the scope of the project, timeline, and payment terms were altered and were consistent with Roy Su's October 27, 2011 email.

Just over two weeks after the alleged modification, on November 14, 2011, CQuest members Hwang, Hamrick and Wallace met with Yahasoft officials Slaughter and Su to introduce the YEIDS system to Bureau of Early Intervention personnel.[2]  The next day, the parties reconvened to review and record Bureau of Early Intervention proposed changes to YEIDS' initial four front-end functions including Demographic Screen, Referral Screen, Parent Screen and Financial Support Screen.  The parties agreed to continue the conversation in the coming weeks.

In January of 2012, Mary Ann Hedlund began managing the newly modified project between CQuest and Yahasoft, which was renamed from EICBO (incorporating the CBO/Back-end functions) to IEIS (incorporating

---

[2]Although Hwang testified he did not "remember the exact meeting," there is a factual dispute as to whether it occurred.

both the front-end and the back-end functions) to reflect the recent change in the scope of the original project. From January of 2012 to October of 2012, Hedlund and Hwang led weekly and sometimes bi-weekly status meetings with Slaughter and Su and Bureau of Early Intervention personnel Jennifer Kepner, Ann Frieburg and/or Blake Whitson to discuss the process of implementing the front-end and back-end system of YEIDS. The subject and topic of the status meetings were memorialized in meeting notes, usually prepared by Hedlund, which reviewed the changes that needed to be made or were being made in both the front-end and back-end YEIDS system for incorporation into IL EI, and included updates on the status of these changes.

Mary Ann Hedlund also prepared and emailed several versions of CQuest's IL EI Project Charter to Yahasoft. Each version of the project charter suggests that the scope of the project was now to include developing and implementing both the front-end and back-end functions. Although CQuest contends there is no evidence it intended the project charters to be written modifications to the SSA, the project charters are probative of the

parties' understanding of the scope of the project.

As part of the key project objectives, each project charter referenced front-end functions and back-end functions.  Each project charter extended the project deadline to June 30, 2013.  Each project charter, under project assumptions, provides that IEIS (which incorporates both front-end and back-end functions) "will replace Cornerstone for Early Intervention case management."

As of March 2012, when CQuest stopped payments to Yahasoft, revisions to the project charters were ongoing and continued to May of 2012.  As of March 2012, the project charter showed that design and development of the project would continue to December 15, 2012, with a project completion date of June 30, 2013.

On June 14, 2012, Wallace sent a letter to Yahasoft that stated the IEIS project must be completed no later than October 1, 2013.  On August 10, 2012, the State of Illinois issued a stop-work order to CQuest directing CQuest to stop developing the front-end system.  On September 14, 2012, Kevin Davis sent a memo to Yahasoft which stated that CQuest was

considering multiple options in light of the State's decision, which "alter[ed] our previous plans for the project and has caused a significant interruption to our process." Given this development, Davis requested that Yahasoft submit a new proposal that included a plan to provide a solution that addresses a number of "critical functions."

On October 5, 2012, Su submitted Yahasoft's EIBOSS (EICBO Data Systems) proposal to Davis, which included only the back-end functions and the costs associated with developing such a system. On October 18, 2012, Su submitted Yahasoft's IKIDS (Illinois Early Intervention Data System) proposal to Davis, which included both the front-end and the back-end system and the costs associated with developing the complete system.

Yahasoft claims that on November 1, 2012, Davis responded to the IKIDS proposal by proposing a new timeframe (November of 2012 to June of 2013).[3] Davis proposed counter payment terms and acknowledged the

---

[3]Apparently, this statement is not in the record. CQuest alleges Su provides no foundation for the statements or a copy of the documents in which the statement can be found.

total system was approximately 40% complete, with the front-end system approximately 70% complete and the back-end system 10% complete.

On November 12, 2012, Su responded to Davis's counterproposal in part by requesting payment by CQuest of Yahasoft's unpaid invoices, totaling $343,333.34.

On December 10, 2012, CQuest proposed the parties enter into a new Master Team Agreement and Nondisclosure Agreement for future cooperation between CQuest and Yahasoft to develop and implement the full YEIDS system in states other than Illinois.  Four days later, Davis followed up regarding the IKIDS proposal.  The memo stated Davis was confident that CQuest and Yahasoft would be able to come to mutually agreeable terms on the IKIDS system, thus building upon the parties' already strong relationship.  On June 13, 2013, CQuest issued a Notice of Termination of the SSA.

When all inferences are construed in Yahasoft's favor, the Court concludes there is at least a factual dispute regarding whether the record shows that both parties believed Yahasoft was now tasked with developing

the entire YEIDS system, instead of only the back-end functions as initially provided in the SSA.  The record shows that in the months and weeks prior to October 27, 2011, there are factual issues as to whether CQuest expressed an intent to implement the entire YEIDS system.

The parties' communications with each other and course of conduct shows there is at least a factual dispute regarding whether, after October 27, 2011, both CQuest and Yahasoft believed that the project was scheduled to be completed by June 30, 2013 instead of June 30, 2012.  Additionally, the invoices sent by Yahasoft to CQuest are consistent with the payment terms proposed by Su in the alleged October 27, 2011.

Based on the parties' communications with each other and their course of dealing and performance before and after October 27, 2011, there are genuine issues of material fact as to whether the scope of the project, its timeline and payment terms were modified in a manner consistent with the alleged email.  The Court concludes those factual disputes preclude the entry of summary judgment.

C. Breach of modified contract

49

CQuest contends that, even if the parties had modified the SSA to extend Yahasoft's time to perform and increase the scope of the project, Yahasoft still breached the modified contract in that it failed to deliver a back end system or a front end system.

When the evidence is viewed in a light most favorable to Yahasoft, the Court assumes that the modified contract extended the timeline to develop the entire YEIDS system to June 30, 2013. Because CQuest terminated the contract on June 13, 2013, the Court is unable to conclude that Yahasoft breached the modified contract by failing to develop the YEIDS system according to the timeline. This is true even though it may be unlikely, based on the alleged small amount of work that Yahasoft performed after October of 2012, that Yahasoft could have completed performance.[4] Additionally, there are factual dispute as to whether either party performed under the contract as modified.

---

[4]After the State's stop-work order on August 10, 2012, CQuest requested additional proposals from Yahasoft, either of which likely would have extended the timeline. However, the parties did not agree on any proposal or counterproposal.

D. Affirmative defenses

CQuest also alleges it is entitled to summary judgment on a number of affirmative defenses raised by Yahasoft in its answer. CQuest is entitled to summary judgment on those affirmative defenses that are not contested by Yahasoft.

Accordingly, the Court will Allow summary judgment in favor of CQuest on the following affirmative defenses asserted by Yahasoft: (1) CQuest's complaint fails to state a claim upon which relief can be granted; (2) CQuest is estopped from bringing its breach of contract claim; (3) CQuest breached an implied duty of good faith and fair dealing; and (4) there has been an accord and satisfaction.

Because the other two affirmative defenses–CQuest's claims are barred by waiver and CQuest breached the contract and cannot recover–are contested, summary judgment is inappropriate as to those affirmative defenses.

## III. CONCLUSION

For the foregoing reasons, there are genuine issues of material fact

regarding aspects of the contract and whether it was modified which preclude the entry of summary judgment.

Ergo, the Motion of Plaintiff CQuest America, Inc. for Summary Judgment [d/e 34] is DENIED as to the breach of contract and/or breach of a modified contract claims.

The Plaintiff's Motion is ALLOWED as to certain affirmative defenses, as provided in this Order.

ENTER: June 28, 2016

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge

52